PRINCE GEORGE'S COUNTY ET AL. *v.* M & B
CONSTRUCTION CORP. ET AL.

[No. 51, September Term, 1972.]

*Decided December 14, 1972.*

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Jess J. Smith, Jr., Associate County Attorney,* with whom were *Walter H. Maloney, Jr., County Attorney,* and *Ellis J. Koch, Associate County Attorney,* on the brief, for Prince George's County, part of appellants.

*James F. Vance* for Prince George's County Civic Federation, Inc., et al., other appellants.

*Russell W. Shipley,* with whom were *Kahler, DeBlasis, Shipley & O'Malley* on the brief, for appellee.

*Amicus Curiae* brief filed by Maryland-National Capital Park and Planning Commission, *Robert H. Levin* and *David D. Freishtat* on the brief.

BARNES, J., delivered the opinion of the Court.

This appeal is concerned with the validity of Resolution No. 244, enacted on May 19, 1970, by the County Commissioners for Prince George's County, sitting as a District Council (Resolution 244). This Resolution authorized cluster development in certain zones within that portion of the Maryland-Washington Regional District situated in Prince George's County.

Although some six issues are presented to us by the appellants, substantially all of them revolve around the basic question whether the provisions in Resolution 244, providing for approval by the Maryland-National Capital Park and Planning Commission (Planning Commission) of a "subdivision plat" indicating cluster development in accordance with Resolution 244, were within the ambit of the subdivision powers of the Planning Commission or were, as the appellants contend, an invalid delegation of the zoning powers of the District Council.

The Circuit Court for Prince George's County (McCullough, J.) sustained the validity of Resolution 244. In accordance with the oral opinion of the lower court rendered on March 16, 1972, that court on March 20, 1972, passed an order declaring Resolution 244 to be constitutional and valid, overruling demurrers to the petition of M & B Construction Corporation, the owner of the property in question and one of the appellees (M & B), denying the County's motion for summary judgment, and granting M & B a writ of mandamus directing the County

to issue forthwith the building permits for the cluster development. A timely appeal was taken to this Court from the order of March 20, 1972. We have concluded that the lower court ruled properly and we will affirm the order of March 20.

The record is a substantial one, but the relevant facts are not in dispute. M & B acquired title to the subject property by a deed dated November 20, 1970. It consists of 3.9305 acres of land, zoned R-55 (One-family, Detached Residential), in the Landover area of Prince George's County. It is approximately one-half mile south of Annapolis Road (Route 450), about one mile north of Landover Road (Route 202), and approximately two miles west of the John Hanson Highway (Route 50). It is basically rectangular in shape with irregular north and south lines. It has a frontage of 343.12 feet on the west side of Warner Avenue and is approximately 600 feet deep. Its southern boundary is between approximately 68 to 106 feet from the north side of Darby Road.

To the north of the subject property is the Cherry Hill apartment development. Across Warner Avenue, to the east, is a public school and a park. The southern boundary of the subject property adjoins the northern boundary lines of the individual appellants, Bishop, et al., whose single-family, detached homes front on Darby Road. The subject property adjoins the western side of single-family homes fronting on Cooper Drive to the west. The neighborhood of the subject property is predominantly residential in character and has been developed with single-family, detached homes selling, at the time of the hearing before the Planning Board on December 23, 1970, at approximately $24,700. The comprehensive zoning map, adopted in 1949, as well as the 1960 master guide plan for the area, placed the subject property and its surrounding area in the single-family, detached zone.

Prior owners of the subject property had sought to have it rezoned from R-55 to R-18 (Multiple-family, Medium-density Residential) once in May 1963 and again in July 1966. In both instances, the Technical Staff of

the Planning Commission recommended disapproval; the Planning Commission recommended approval; but the District Council denied the requested rezoning in May 1964 and June 1967, respectively.

As we have indicated, the District Council, on May 19, 1970, adopted Resolution 244 enacting certain amendments to the zoning ordinance and subdivision regulations applicable to the Maryland-Washington Regional District in Prince George's County, authorizing the Planning Board to approve cluster subdivisions, pursuant to the provisions of Resolution 244. The amendments were applicable to the R-R, R-80, R-55 and R-T zones to permit clustering development as a *principal permitted use* in those residential zones. Provision was made for a reduction in lot size in each of the zones mentioned from the conventional lot size to a smaller one; but the lots were to be no less than an established minimum square footage. The construction of town houses was permitted in each of the zones under cluster development; and each town house was required to have a square footage of not less than an established minimum, usually 1,500 square feet.

Section 27 of the zoning ordinance was amended by adding a new Section 27.9 to establish criteria and guidelines to be followed by the Planning Board in approving a cluster subdivision. Section 27.91 sets out the purpose of the amendatory legislation, as follows:

> "The purpose of cluster development is to permit a procedure for development which will result in improved living and working environments; which will promote more economic subdivision layout; which will encourage a variety of types of residential dwellings; which will encourage ingenuity and originality in total subdivision and individual site design; and which can preserve open space to serve recreational, scenic, and public service purposes and other purposes related thereto *without altering exist-*

*ing densities or building bulk for the net tract area."*
(Emphasis supplied.)

Then follow four provisions to "achieve these goals," *i.e.*:

"(a) Variations in lot areas and building dimensions are permitted.

"(b) A greater variety of building types is permitted in residential zones.

"(c) Procedures are established to assure adequate maintenance and restricted use of open space areas for the benefit of the inhabitants of the subdivisions or for dedication to public use.

"(d) Procedures are established to assure adequate protection of existing and potential developments a d j o i n i n g the proposed planned unit and cluster development."

Section 27.92 provides that all types of attached and detached single-family residential buildings may be permitted in cluster developments; and Section 27.93 states that cluster developments shall consist of at least 16 dwelling units unless the Planning Board finds that they are a logical extension of an existing or approved cluster development, in which event, the cluster development may contain fewer dwelling units.

Section 27.94 requires that:

"No cluster development may be constructed except in accord with a *Preliminary Subdivision Plan approved by the Prince George's County Planning Board under the Regulations for the Subdivision of land.*"
(Emphasis supplied.)

Modification of yard, building dimensions and lot area requirements are provided for in Section 27.95 as shown on an approved Preliminary Subdivision Plan.

Sections 27.96, 27.97 and 27.98 relate to cluster open space requirements. They provide that the conventional lot size may be reduced to a specified lot size in the cluster development, but that the lot size reductions shall be compensated for by an equivalent amount of open space in the net tract area. Cluster open space shall be made available for the use of all residents of the County unless the Planning Board "finds that the size, location, type of development, or cost of development or maintenance of such cluster open space, or the availability of public open space, would make public use undesirable or unnecessary. The Planning Board generally will require dedication of all areas indicated for acquisition in the adopted Park Acquisition Program." If not dedicated to public use, the cluster open space shall be protected by legal arrangements, satisfactory to the Planning Board, to insure "its maintenance and preservation for whatever purpose it is intended." Some details of the "legal arrangements," such as covenants and the like, are then given, followed by a provision for "any other specifications deemed necessary by the Planning Board." One-third of the area of cluster open space located in a flood plain shall qualify and all other cluster open space shall qualify as net tract area.

Section 27.99 sets forth provisions in regard to a Preliminary Subdivision Plan, as follows:

"An approved Preliminary Subdivision Plan for a cluster development shall provide for a total environment better than that which could be achieved under standard regulations. If, in the opinion of the Planning Board, the proposed plan could be improved in respect to the criteria listed below, by the reasonable modification of the location of cluster open space or buildings, or configuration of lots, the proposed plan shall be so modified or denied. In acting on a proposed plan the Planning Board shall give particular consideration to the following criteria:

"(a) The usability of cluster open space for a recreational, public service or scenic purpose. Usability shall be judged in terms of size, shape, location and topography of the space. Space designed for a recreational or public service purpose should be easily accessible to pedestrians. Space designed for a scenic purpose should be visible from a significant number of buildings or a significant length of street right-of-way, and should be designed to include irreplaceable natural features located in the tract (such as, but not limited to, stream beds, significant stands of trees, rock outcroppings).

"(b) The relationship of individual buildings and lots to the total environment. Buildings and lots whose locations and dimensions vary from the standard requirements of the applicable zone should be arranged and situated to minimize alteration of the natural terrain, to avoid adverse effects of shadows, noise and traffic on the occupants of the building and surrounding properties, to improve the view from and the view of buildings, to lessen the land area devoted to vehicular access, and to encourage diversity in design."

Section 27.99A provides for an appeal. This section states:

"Planning Board action on a cluster development *may be appealed to the District Council by the applicant or by any owner of property adjacent to the subject property or adjacent to any contiguous property owned by or under contract sale to the owner of the subject property.*

> The appeal shall be filed with the Clerk to the Board of County Commissioners within ten (10) days following *notice of action* on the cluster proposal *by the Planning Board to all parties of record at the hearing thereon.*"
> (Emphasis supplied.)

Resolution 244 also amended the subdivision regulations by providing for certain definitions for "Total Tract Area," "Net Tract Area" and "Cluster Open Space." Provision was also made for the filing and processing of Preliminary Subdivision Plans and included a requirement that stamped envelopes addressed to the owners of land adjacent to the subject property and any contiguous land owned or under contract of purchase by the owner of the subject property be included with the Preliminary Subdivision Plan. Preliminary Subdivision Plans for planned unit and cluster developments may be filed in the first and last seven calendar days of the month.

The provision for a public hearing was, as follows:

> "The Planning Board shall notify all owners of properties adjacent to the subject tract or adjacent to contiguous lands owned by or under purchase contract to the owner of the subject tract, that a cluster proposal has been filed, and shall identify the location of the subject proposal. Owners of adjacent properties shall be informed that a public hearing on the question of whether or not the proposed cluster development would adversely affect properties adjacent to it will be held, if such request is made by the owners of any adjacent property within thirty (30) days of the mailing of the letter informing the recipient of a cluster proposal. If such public hearing is held, all persons notified of the cluster proposal shall be notified by certified mail of the time and place of the public hearing not less than ten (10) days prior to the public hearing. In the case of substantial change to the

cluster proposal in relation to the general location of residential lots, open space, or traffic access and egress points after the hearing, adjacent property owners shall be notified of the change and the proposal shall be available for inspection at the Prince George's County Planning Office."

Resolution 244 provided that an approved preliminary plan for a cluster development shall be the site plan for the development of the subject property; that any lots in the cluster development shall comply with the minimum lot size and average lot size requirements in the applicable zone; that all public roads, sidewalks, curbs, gutters and storm drainage facilities comply with applicable laws and regulations; that no town house lots shall be located within 50 feet of the boundary line of a property in an R-R, R-80, or R-55 zone which has not been approved as a planned unit and cluster development; that all dwellings and other buildings in the cluster development must be served with public sewer and water mains; and, that a signed statement of conveyance of cluster open space to the appropriate public agency or cooperative association be placed on the record plat, if appropriate, the form for such statement being set out in the legislation. It was also provided, however, that the Planning Board could exempt a cluster development from the requirement of Section 3 of the subdivision regulations [1]:

". . . if the Planning Board finds that cluster development will result in greater amenity and efficiency in the use of land for the benefit of

---

1. Section 3 of the subdivision regulations contains the general requirements for land subdivision, with provisions for minimum widths of streets, highways, parkways, secondary highways, minor streets and crosswalks in blocks over 750 feet long. There are also provisions in regard to the location of lots, side and rear yards, parking requirements and various criteria to be considered by the Planning Board in granting preliminary approval of a subdivision plat. A provision is included in regard to variation of the general requirements when, in the opinion of the Commission, "a strict observance of these Regulations will cause undue hardship."

its residents and users and those in the surrounding area, than would be possible under conventional development."

There are also provisions in regard to amendment and withdrawal of the subdivision plat for cluster development, as well as in regard to other requirements for the record plat.

M & B, on October 27, 1970 (shortly prior to the date legal title to the subject property was acquired by the deed of November 20, 1970), submitted to the Planning Commission a Preliminary Subdivision Plan for cluster development of 20 town houses in four clusters. The required notices were given and a hearing was held before the Planning Board on December 23, 1970. Richard Mangy, principal Urban Designer of the Technical Staff, testified in regard to the Technical Staff report recommending approval for the proposed cluster preliminary subdivision, subject to a revised site plan in accordance with the staff's recommendations. This was done later and the final cluster subdivision plat was approved by the Commission and the Planning Board on May 26, 1971, and was recorded on July 2, 1971, as Plat No. 3 in the Plat Book of the Land Records of Prince George's County, Plat Book WWW 77. As finally approved, the subdivision plat shows four clusters of town houses all 75 feet deep, and all 20 feet wide, except the eight houses at each end of the respective clusters, which are 20.33 feet wide. The easterly cluster, 24 feet from the west side of Warner Avenue, consists of six town houses; the westerly cluster contains four town houses, while the northerly and southerly clusters each have five town houses. The southerly side of the five-house cluster to the north of the residential properties facing on Darby Road is 50 feet from the northerly line of those properties; and the south wall of the four-house westerly cluster is 98 feet from those same properties. There is a 34 foot by 100.66 foot open space between the northerly and southerly clusters and a 10 foot space between the westerly and easterly clusters and the sides of the northerly and southerly clusters,

respectively. In addition to the other open spaces surrounding the clusters on the north, south and east, approximately one-half of the subject property to the west of the westerly cluster is open space. This area has a substantial grade, is wooded and will not be disturbed by the proposed construction. The subdivision plat indicates that the westerly portion of the subject property, marked Parcel A, shall be conveyed to the Landover Estates Community Association, Inc. "for use in common by owners of all the lots in this subdivision in accordance with said Declaration of Covenants, Conditions and Restrictions" [being those dated May 10, 1971, and recorded among the Land Records of Prince George's County in Liber 3952, folio 24, to which the plat recites the property is subject]. The final subdivision plat also contains a surveyor's certificate and the owner's statement of acceptance and dedication of the street for public use.

Mr. Mangy gave reasons for approval of the preliminary cluster subdivision plan, subject to recommended modifications, as follows:

> "The recommendation for approval is based in part on the following findings: (1) * * * The environment is considered to be better than that which could be achieved under regular development and this is the proposal. This is one or probably the only scheme that could be accomplished under standard regulations. A second point is that the proposed cluster plan provides for better preservation of usable open space for the use of the residents as opposed to a standard development.
>
> "(Mr. Chairman) Mr. Mangy, you're pointing first to Exhibit 1, showing the proposal?
>
> "(Mr. Mangy) This is correct.
>
> "(Mr. Chairman) And Exhibit 2 is showing what might be developed under the existing or regular subdivisions?
>
> "(Mr. Mangy) How the site could be developed under the standard regulations—using

standard regulations. The open space then also is readily available to the residents and a pedestrian system is indicated that links the development with the open space. The density of the development in the cluster proposal is not of a greater density than that which could be obtained under regular development."

\* \* \*

"The buildings in the cluster proposal have been arranged to avoid adverse effects of automobiles and traffic. Specifically, by excluding automobiles from a central pedestrian court area. We also feel, the staff feels, that the proposal provides a good transition between an existing single-family detached area and an apartment. Three-story garden apartment complex to the North. The concept shown in the cluster grouping, the dwelling units around a central pedestrian court, is viewed as being a good design concept that provides an environment that would be a much better living environment than that shown under standard regulations with a street separating the houses and a finding is that there is sufficient public facilities programmed for the existing area. Although we agree with the concept and recommend approval of this concept, the staff feels that there are several problems with the design and layout of the site plan itself, and would recommend modification of the plan in accordance with the recommendations that we make. Generally, the problems are seen by the staff as being—first of all, the parking area is viewed as being first visually detrimental because of its large mass to, first of all, the residents themselves, secondly, to persons passing by on the public street, thirdly, to a lesser degree, to the adjacent single-family detached residents to the South. One other problem is this. Season park-

ing is the excessive distance from the dwelling units. Particularly, in this area of the proposal. We feel that all that parking should be provided as close and convenient as is possible for all the residents in this dwelling in keeping with any single-family development."

* * *

"While we have said that the grouping of these dwelling units around the pedestrian court is a very good idea, we feel that this idea should be strengthened and could be strengthened by making this a tighter arrangement and even to the extent of eliminating the front yards and putting all of the yard area to the back of the townhouses. What we think could be created here is a series of spaces that the residents of this development could use depending on their immediate mood. The front of the units could be a very tight pedestrian court—a place for social interaction of the residents. A place for children to play. A place that would [be] essentially secure in a psychological sense. To the rear of the units then would be a larger open private yard for each individual, for the use of each resident and his family to entertain or be by themselves. Then beyond that, a larger open public space, again, a place where you would meet other people. This concept we would like to see accomplished by tightening up this group. Also, with respect to the townhouse units, we'd like to see some sort of variation in the placement of the units to add a little variety, I think, and a little excitement to the space when it's created, rather than a straight line in a straight shot of dwelling units.

"This in line then with our identification of what we feel are some of the problems of the site layout we've listed five specific recommendations for a site plan revision: (1) reducing

the visual and physical mass of the parking area and (2) attempt to locate it closer, as close as is possible, to the majority of the dwelling units. * * * (3) Certainly provide adequate visual screening between parking and any open space any residents or any public streets which is important to the residents and to persons in the public street. (4) Develop a tighter grouping of the units to accomplish some of the things I mentioned earlier. And (5) I think we would like to see the pedestrian system, especially out in this area, take a more logical form as far as the desire or the use of the residents. We feel that the paths meander and if you were living here and you were going to go here you would not follow the existing path system because it just is an illogical way to go and we feel that some improvement could be made there connecting the residents with each other and connecting the dwelling units with it, specifically the school site up in the area. Now, one of the recommendations is that the cluster open space shown be retained in Home Owners Association for the use of the residents."

There was other supporting testimony given by W. Stanley Machen, a surveyor and civil engineer, and Joseph Neulan, his assistant, representing M & B. Mr. Neulan testified, in part, as follows:

"If this property were developed on a conventional basis, a single-family detached, in lieu of single-family attached, a previous determination of the street grade was made by another engineering firm, namely, Westerns Annis Associates, and they had proposed Bardon Court, if that be the name of it, which started at existing Warner Avenue, and it would require a landing grade here, and then, in order to utilize the full property, would get into a 12% grade

on the street this is now, and then terminate in a flattened area in the turn around of the cul-de-sac of about a 5% grade. Now, percentage is expressed in so many feet per hundred, in this case, in a 100 foot horizontal distance on a 12% grade, that means that the street would rise 12 feet in 100 feet. And a 5% grade would be 5 feet in 100 feet. So that we do have a bad condition to begin with for developing on the conventional basis since our County Department of Public Works would desire that we keep these street grades on streets which they must maintain and approve for acceptance into the County's system—they don't like to go over 10% because it is a steep grade when you get icy conditions and you have a hazard there as far as safety is concerned—all these various aspects. So that we're in excess of what the County would desire as far as street grades go in a conventional basis. And, when we get to the head of this court because we can't really steepen this up any more, we have already exceeded the maximum by a couple of per cent and the street grade, then we're in a situation where mass grading is going to be required for all this area up here and getting this street up, then we are then burdened by having to fill all these lots down here so, therefore, we have to clear all the trees there. And the sum substance is that if this development were constructed on a conventional basis as you see by Exhibit 2 here, any woods that are now there that you might see and there are some very fine specimens of trees up in this area, would be denuded—there would be nothing left—there would be considerable grading operation which we would have to carry out. I don't have any figures on that but it would be a costly operation. This isn't the consideration at here,

but it would destroy the—in my opinion—very fine natural area that is in there now."

\* \* \*

"By this layout, all of those costs are reduced, to the consumer and to the taxpayer. There is no cost to the taxpayer here as far as any maintenance of any interior streets because under the Home Ownership Agreement, these individual owners will, therefore, maintain their own parking facilities, all their own site improvements, and someone gets out of a few tax dollars that way."

He further stated that the town houses would be of two-story traditional design as compared with the three-story garden-type apartment buildings situated to the north of the subject property. The cluster development would result in approximately a 35% reduction in runoff of water on the subject property. The contemplated cost of the town houses would be between $25,000 and $26,000.

At least three of the adjoining property owners were present at the hearing; and two of them had indicated that they wished to speak, i.e., Mrs. F. R. Bishop, 6738 Darby Road, and John Pencilunas, 6734 Darby Road. Mr. Pencilunas asked a question in regard to the drainage and made other comments. Mrs. Bishop stated that her objection was the loss of a natural buffer of trees behind her home, she stating that when the apartments farther north were to be erected, she was promised that there would be a natural buffer of trees between her property and those apartments. The protestants were present when the Planning Board unanimously approved the subdivision plan for the cluster development subject to being revised in accordance with the recommendations of the Technical Staff. They were advised to keep in touch with the situation and that the Planning Board would review the revised plan on January 11, 1971, to which date the hearing was continued.

The Planning Board did reconvene on January 11, took additional testimony and unanimously approved the revised subdivision plan. In its Resolution of approval of January 11, the Planning Board made the following findings:

"1. The proposed cluster plan results in a living environment better than that which could be achieved under the standard regulations.

"2. The proposed plan provides for better preservation of existing natural features than under regular development standards.

"3. Open space is preserved to serve the residents and a pedestrian circulation system is provided allowing residents good access to this area.

"4. The density of development for the net tract area is not altered from that of development under regular standards.

"5. The buildings have been arranged to avoid the adverse effects of traffic, and land devoted to vehicular uses is less than under regular development.

"6. The development provides a reasonable visual and physical transition between existing single family detached units to the south and apartment units to the north.

"7. The concept of grouping the dwelling units to form a pedestrian space represents a good design approach.

"8. There are sufficient public facilities programmed for or existing in the area."

No appeal was taken from this action to the District Council as provided for in Section 27.99A of Resolution 244.

On July 12, 1971, the County Office of Law at the request of William W. Gullett, the County Executive, issued a formal opinion that the action of the Planning

Commission in approving cluster subdivision plats was improper in that, in the opinion of the County Attorney, such approval amounted to a rezoning of the properties involved and the attempted delegation of the power to rezone being invalid, building permits for such developments should therefore be denied. In reliance on this opinion, the County Department of Inspections and Permits, by a letter of July 22, 1971, to M & B, stated that its building permits for the cluster development would be "held in abeyance until such time as the land in question has been rezoned from the standard zone to the cluster zone." Upon appeal by M & B to the County Board of Appeals from this action, the Board of Appeals sustained the action substantially upon the grounds set forth in the opinion of July 12, 1971, of the County Attorney.

As we have stated, M & B thereafter filed its petition for the issuance of a writ of mandamus and declaratory judgment and other relief in the Circuit Court for Prince George's County. Judge McCullough decided that Resolution 244 was constitutional and valid and directed that the writ of mandamus, commanding the County officials to issue the building permits, issue.

The County and the individual appellants briefed and argued six questions before us on appeal. We shall consider them in the order used by the appellants.

### (1)

The appellants first contend that the functions of the Planning Board under Resolution 244 amount to an attempted delegation by the District Council of zoning functions which may not lawfully be done. We do not agree with their contention.

We may first observe that the appellants do not contend that there were any procedural or technical defects in regard to the adoption by the District Council of Resolution 244. Nor, of course, is any contention made that the District Council does not have the power to amend its zoning ordinance.

The Act of the General Assembly of Maryland of

1959, Chapter 780, § 75, as amended, codified as Section 59-80 of the Public Local Laws of Prince George's County, provides, in relevant part, as follows:

"The county council of Montgomery County and the board of county commissioners of Prince George's County are respectively empowered, in accordance with the conditions and procedures specified in section 59-81, 59-82, 59-83, 59-86, 59-87, 59-89, 59-90, 59-92 and 59-100, to regulate in the portion of the regional district lying within its county, (1) the location, height, bulk and size of buildings and other structures, building lines, minimum frontages, depths and areas of lots, and *percentages of lots which may be occupied;* (2) the sizes of yards, courts, and other open spaces; (3) the erection of temporary stands and structures; (4) *the density and distribution of population;* (5) the uses of buildings and structures for trade, industry, residence, recreation, agriculture, public activities, or other purposes; and (6) the uses of land for trade, industry, residence, recreation, agriculture, forestry, or other purposes. * * *"
(Emphasis supplied.)

We have already set out rather fully the provisions of Resolution 244 and need not repeat them here. We emphasize, however, that in the recited purpose of Resolution 244, it is stated that it was not intended to alter "existing densities or building bulk for the net tract area," and further, that cluster developments are a *permitted use* in the residential zones enumerated, including the R-55 zone. In spite of some loose use of language by certain officials of the County (see the letter of July 22, 1971, from the Department of Inspections and Permits to M & B referring to a "cluster zone," for example), there is no "cluster zone" in Prince George's County. As we have said, cluster development is a permitted use in certain residential zones and is not the subject matter

of any separate zone. As we will indicate more fully later in this opinion, the functions entrusted to the Planning Board by Resolution 244 were subdivision functions over which the Planning Commission (of which the Planning Board is an integral part) already had jurisdiction by virtue of the Act of 1959, ch. 780, § 70, as amended, codified as Section 59-75 of the Code of Public Local Laws of Prince George's County. As we analyze the relevant legislation, the District Council exercised *its* zoning functions in amending the zoning ordinance to provide for cluster development as a permitted use by Resolution 244 and further provided for the *implementation* of the amendment by means of the subdivision functions already possessed by the Planning Commission and the Planning Board in accordance with adequate guides and standards set forth in the amendatory legislation.

The case closest in point on this question is *Chrinko v. South Brunswick Township Planning Board,* 77 N. J. Super. 594, 187 A. 2d 221 (1963). In that case, the enabling legislation under which the South Brunswick Township (Township) enacted its "cluster" ordinance was almost identical in its relevant provisions to the enabling legislation involved in the present case. See New Jersey Statutes Annotated, 40:55—30. Like the instant case, the Township ordinance provided for cluster development as a *permitted use* in residential zones and left to the Township's Planning Board the determination of whether or not the cluster development should be permitted within the provisions relating to that permitted use. The Court in *Chrinko* sustained the validity of the Township ordinance. Judge Furman aptly stated:

> "Although the state zoning law does not in so many words empower municipalities to provide an option to developers for cluster or density zoning, such an ordinance reasonably advances the legislative purposes of securing open spaces, preventing overcrowding and undue concentration of population, and promoting the general welfare. Nor is it an objection that

uniformity of regulation is required within a zoning district, *N.J.S.A.* 40:55—31. Such a legislative technique accomplishes uniformity because the option is open to all developers within a zoning district, and escapes the vice that it is compulsory. *Midtown Properties, Inc. v. Madison Tp.*, 68 *N.J.Super.* 197, 210, 172 *A.2d* 40 (*Law. Div.* 1961).

"Zoning ordinances in rapidly growing municipalities may be founded on an outmoded concept that houses will be built one at a time for individual owners in accordance with zoning regulations, with latitude for variances in hardship or other exceptional cases, and that the municipality can take steps whenever warranted to acquire school, park and other public sites. Such a gradual and controlled development is not practicable in many municipalities today. Confronted with a subdivision plan for several hundred homes in a tract meeting all water drainage, sanitation and other conditions, a municipality must anticipate school needs but without lands set aside for that purpose; it must anticipate a large population concentration without recreation areas, parks or green spaces, or lands for firehouses or other public purposes. Cluster or density zoning is an attempted solution, dependent, as set up in the South Brunswick zoning ordinance, upon the agreement of the large-scale developer whose specific monetary benefit may be only that he saves on street installation costs.

"Other principles favoring cluster or density zoning are the presumption of validity attaching to zoning as well as other legislation, *Ward v. Montgomery Tp.*, 28 *N.J.* 529, 539, 147 *A.2d* 248 (1959), and the liberal construction to be accorded to the powers of municipal corporations, including those granted by necessary or

fair implication or incident to those expressly conferred, under the *N.J.Const. Art.* IV, § VII, par. 11."

(77 N. J. Super. at 601-602, 187 A. 2d at 225-226.)

The present case should be distinguished on this point from the cases involving the creation of a separate Planned Unit Development (PUD) *zone,* such as were involved in *Cheney v. Village 2 At New Hope, Inc.*[2], 429 Pa. 626, 241 A. 2d 81 (1968) and *Millbrae Association for Residential Survival v. City of Millbrae,* 262 Cal. App. 2d 222, 69 Cal. Rptr. 251 (1968). We will comment more fully upon these cases later in this opinion.

For an interesting and helpful discussion of "Planned Unit Development" generally, see the symposium on that subject in 114 U. Pa. L. Rev. 3-170 (1965). Many distinguished scholars, as well as an experienced developer, contributed to the symposium. Included were Gerald D. Lloyd, a developer in the state of New York; Professor Jan Z. Krasnowiecki, of the University of Pennsylvania Law School; Professor Daniel R. Mandelker, of the Washington University School of Law at St. Louis, Missouri; several English planners; David W. Craig, former City Solicitor of Pittsburgh, Pennsylvania; and, Richard F. Babcock of Chicago, Illinois. Of particular interest in the present case is Professor Krasnowiecki's discussion of the role of the courts, 114 U. Pa. L. Rev., at 63-78.

It is clear to us that Resolution 244 does not delegate a zoning function to the Planning Board but merely provides for the exercise by that Board of subdivision powers, well within such powers already conferred upon it by the relevant enabling legislation.

### (2)

The appellants secondly contend that there is an unlawful delegation of legislative power to the Planning

---

2. Reported in official reports as Village 2 At New Hope, Inc. Appeals.

Board by Resolution 244 because of the alleged lack of sufficient guides and standards.

Inasmuch as there are some areas in which the Planning Board exercises its discretion in applying the subdivision functions given to it by Resolution 244, adequate guides and standards are required to be established by the legislation "to protect the citizen against arbitrary or unreasonable exercise thereof." *Pressman v. Barnes,* 209 Md. 544, 552, 121 A. 2d 816, 820 (1956). *See Gino's of Maryland, Inc. v. City of Baltimore,* 250 Md. 621, 640-641, 244 A. 2d 218, 229 (1968).

In our opinion, there were ample guides and standards set forth in Resolution 244 to guide the Planning Board. In addition to the specific limitations established in other provisions, the purpose of cluster developments appearing in Section 27.91 and the specific criteria set forth in Section 27.99 (both provisions have been quoted in full, *supra*) are quite sufficient guides and standards. Indeed, they are far fuller and more explicit than were the guides and standards approved by the Court in prior cases. *See, e.g., Turf Valley Associates v. Zoning Board of Howard County,* 262 Md. 632, 640-642, 278 A. 2d 574, 578-579 (1971) and cases therein cited and analyzed; *Givner v. Commissioner of Health,* 207 Md. 184, 189-191, 113 A. 2d 899, 901-902 (1954).

### (3)

The third contention by the appellants is that "county residents" are denied due process of law contrary to Article 23 of the Declaration of Rights in the Maryland Constitution and to the Fourteenth Amendment to the Federal Constitution. This contention is principally predicated upon the proposition that the protections in regard to notice afforded in rezoning cases are not granted by Resolution 244 for proceedings before the Planning Board and notice and the right to be heard are limited under Section 14 (d) to *adjacent* property owners.

The short answer to the first part of the contention of the appellants is that the proceeding before the Planning

Board involves subdivision and not rezoning as we have already stated. The proceeding in regard to approval of a preliminary subdivision for a particular parcel of land for cluster development—a permitted use—concerns primarily the *adjacent* property owners so that notice by mail to them, with their right to be heard and to appeal, affords, in our opinion, due process of law. See *Schroeder v. City of New York,* 371 U. S. 208, 211, 83 S. Ct. 279, 282, 9 L.Ed.2d 255, 258-259 (1962) ; *Mullane v. Central Hanover Tr. Co.,* 339 U. S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865, 873 (1950) ; *United States v. Chatham,* 323 F. 2d 95 (4th Cir. 1963) ; *Union Investors, Inc. v. Montgomery County,* 244 Md. 585, 224 A. 2d 453 (1966) ; *Hyson v. Montgomery County Council,* 242 Md. 55, 217 A. 2d 578 (1966) ; *Himes v. City of Flint,* 38 Mich. App. 308, 196 N.W.2d 321 (1972).

It is interesting to note that in *Millbrae Association for Residential Survival v. City of Millbrae, supra,* the ordinance of the municipality in creating "Planned Development Zones," provided that the municipal Planning Commission should approve a "Project Precise Plan" before the building permit should issue. There was, however, in that ordinance no *requirement* of a hearing prior to such approval, the holding of a hearing being left entirely to the discretion of the Planning Commission. Although the Court indicated in *Millbrae* that the Planning Commission had departed from the specified standards in approving the Project Precise Plan in that case, no point was made in regard to the lack of a *requirement of any hearing* prior to approval of such a plan.

### (4)

The appellants fourthly contend that Resolution 244 is invalid as contrary to the Prince George's County Charter which, in its terms, prohibits "floating zones" and "conditional zoning." *See Dal Maso v. Board of County Commissioners for Prince George's County,* 264 Md. 691, 288 A. 2d 119 (1972). The Supreme Court of Pennsylvania in *Cheney, supra,* held that the planned unit

development zone involved in that case was not a "floating zone," 429 Pa. at 634, 241 A. 2d at 85.

It is apparent to us that the County Charter does not purport to prohibit cluster development so that we see no merit in this contention.

### (5)

The fifth contention of the appellants is that Resolution 244 is invalid as contrary to the requirement in the applicable enabling legislation that zoning regulations "shall be uniform for each class or kind of building throughout any district or zone," as set forth in the Act of 1959, ch. 780, § 26, as amended (codified in the Code of Public Local Laws of Prince George's County as Section 59-81). We have already decided that the Planning Board is not exercising zoning powers in passing upon the propriety of cluster developments. Assuming for the argument, however, that the requirement for uniformity is applicable, it may be observed that any property owner in the respective residential zones may apply for cluster development. As Judge Furman stated in *Chrinko, supra,* "Such a legislative technique accomplishes uniformity because the option is open to all developers within a zoning district, and escapes the vice that it is compulsory." 77 N. J. Super. at 601, 187 A. 2d at 225.

### (6)

Finally, as their sixth contention, the appellants urge that the District Council had no power to hear an appeal from the Planning Board when Resolution 244 was adopted and hence that Resolution was invalid for this reason in spite of its severability clause. This contention, however, was not raised below and was not decided by the lower court. We, therefore, will not consider it for the first time on appeal. Maryland Rule 885.

*Order of March 20, 1972, affirmed, the costs to be paid by Prince George's County, one of the appellants.*