522 A.2d 1328

**WEST MONTGOMERY COUNTY CITIZENS ASSOCIATION et al.**

v.

**MARYLAND–NATIONAL CAPITAL PARK AND PLANNING COMMISSION et al.**

No. 124, Sept. Term, 1985.

Court of Appeals of Maryland.

April 1, 1987.

Motion for Reconsideration Denied
June 2, 1987.

---

184

Roger W. Titus, Rockville, for appellant.

Paul A. McGuckian, Co. Atty., Rockville (Jane E. Allan Associate General Counsel and Arthur S. Drea, Jr., Gen. Counsel on the brief), Silver Spring, for appellees Maryland-

Nat. Capital Park and Planning Com'n and Montgomery County.

Vincent J. Fuller (Raymond W. Bergan, Judith A. Miller and Williams & Connolly, Peter N. Kyros, Jr., Paul C. Fiduccia and Winston & Strawn, on the brief), Washington, D.C., for appellee PGA Tour, Inc.

Stephen Z. Kaufman, Larry A. Gordon and Linowes & Blocher, on the brief, Silver Spring, for appellee Rock Run Ltd. Partnership.

Argued before MURPHY SMITH * ELDRIDGE COLE RODOWSKY COUCH and McAULIFFE, JJ.

McAULIFFE, Judge.

We shall here invalidate a Montgomery County zoning decision concerning density of residential development because that decision was made by the District Council through the planning process, rather than through the zoning process mandated by State law.

■ A county enjoys no inherent power to zone or rezone, and may exercise zoning power only to the extent and in the manner directed by the State Legislature. *Crozier v. Co. Comm. Pr. George's Co.*, 202 Md. 501, 505–07, 97 A.2d 296 (1953). The Regional District Act, Md.Code (1957, 1983 Repl.Vol.) Art. 28, § 8–101(b) grants zoning power to the Montgomery County Council sitting as a District Council. By that section, the Legislature specifically defines zoning power to include the right to regulate "the density and distribution of population" and authorizes the District Council to exercise that power by "amend[ing] the text of the zoning ordinance and ... by ... amend[ing] the map or maps accompanying the zoning ordinance text...." By using the process of amending a Master Plan to effect a

---

* Smith, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

significant increase in the permissible density of development of residential zones, the District Council has run afoul of the state mandate that zoning changes be made by zoning procedures. Moreover, the alternative argument, that the density decisions were not made by the District Council but were made by the Planning Board pursuant to a valid delegation of legislative power, is unavailing because of the breadth of the power involved and the failure of the District Council to establish sufficiently precise standards.

In October, 1980, the Functional Master Plan for the Preservation of Agriculture and Rural Open Space in Montgomery County ("Agricultural Preservation Plan") was approved and adopted. This plan recommended broad and innovative changes in the zoning text of Montgomery County, to be followed by dramatic zoning map changes that would directly affect one-fourth of the land in the County. The principal purpose of the plan was to preserve open space and agricultural land in the upper part of the County by restricting development of the land. An important adjunct of the plan was the recommendation that Montgomery County adopt and implement a system of transferable development rights ("TDRs"), to provide a form of compensation to owners whose rights to develop their properties would be significantly impaired by down-zoning, and to help ensure long term preservation of the agricultural use of the land.

The concept of TDRs is simple and straightforward. Ownership of land carries with it a bundle of rights, including the right to construct improvements on the land. These rights are subject to governmental regulation where reasonably required to accommodate public health, safety, or general welfare, and ordinarily these limitations of use may be imposed without the necessity of paying compensation to the land owner. There may arise situations, however, where the limitation of use imposed for the public good inflicts an economic impact on the landowner that, while not confiscatory, is so substantial as to prompt the government to provide some type of compensation. Cases involving the

preservation of scenic easements and historic or architecturally valuable landmarks, preserving as they do benefits to the public that are largely cultural or aesthetic, yet concentrating the burden upon relatively few, have moved government officials to find ways to compensate the affected property owners. Maryland, recognizing the importance of agricultural land, and the efficacy of restricting the right to develop land as a means of accomplishing that objective, has developed a system for purchasing agricultural land preservation easements. See Md.Code (1974, 1985 Repl. Vol.) Agriculture Article, §§ 2–501 thru 2–515. Purchasing development rights with public funds is not the exclusive method of providing compensation, however. Other jurisdictions have accomplished the desired objective by permitting the transfer of development rights from the burdened property to certain other properties in the political subdivision, and have given value to this right by permitting a greater than normal intensity of development of the transferee or "receiving" property. *See, e.g. Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Fred F. French Investment Co. Inc. v. City of New York.*, 39 N.Y.2d 587, 385 N.Y.S.2d 5, 350 N.E.2d 381 (1976).

Montgomery County chose the latter course—the creation of a system of transferable development rights. In accordance with the recommendations of the Agricultural Preservation Plan, the District Council amended various provisions of the zoning text to provide for a new Rural Density Transfer zone ("RDT zone") having a base density of one single family dwelling unit for each 25 acres, and to create TDRs in favor of the owners of property placed in that classification. Montgomery County Code, 1984, §§ 59–C–11.2 thru 59–C–11.5. The owners of property down-zoned to the RDT zone are granted one TDR for each five acres, less one TDR for each existing dwelling unit. Other amendments to the zoning text provide that if the owners execute a covenant not to develop their land at its base density, the TDRs can be transferred to any property within

a properly designated receiving zone, and under certain circumstances can be used to increase by one dwelling unit per TDR the density of development of the receiving property. The text provides that any property in six designated single family residential zones [1] is eligible for designation as a receiving area for TDRs. The actual designation of the properties that would constitute the "receiving zone," *i.e.* those designated as available for more intense development through the use of TDRs, is to be made through the planning, rather than the zoning process. Section 59–C–1.-39 provides:

> Any property in the RE–2C, RE–2, R–200, R–150, R–90 and R–60 zones that is located in a receiving area designated in an approved and adopted general, master, sector or functional plan may be developed at an increased density by the transfer of development rights in accordance with sections 59–A–6.1, and 59–C–11. . . .

Section 59–C–11.4 provides:

> In accordance with § 59–A–6.1 and in conformance with an approved and adopted general, master, sector or functional plan, residential density may be transferred at the rate of one development right per five (5) acres less one development right for each existing dwelling unit, from

---

1. The six zones presently designated by § 59–C–1.39 of the Montgomery County Code are: RE–2, RE–2C, R–60, R–90, R–150 and R–200. The first text changes following the adoption of the Agricultural Preservation Plan designated the RE–1 and RE–2 zones as eligible for designation as receiving areas. In March of 1982, the R–200, R–150, R–90 and R–60 zones were added. In October of 1982, Ordinance 9–89 was adopted, for the stated purpose of including the RE–2C zone. The ordinance amends the "tag line" of § 59–C–1.39 to add the RE–2C zone to the six zones then existing, but in the text of that section as set forth in the ordinance, the RE–1 zone is inexplicably omitted. Because the RE–1 zone is not involved in this case, we have assumed that the text of the ordinance controls and that there are now six designated zones, but we expressly do not decide the effect of what appears to be a clerical error in the ordinance. The single family residential zones not included as eligible for designation as receiving areas are those provided for mobile home communities, townhouses and fourplex developments, which by their nature are not suitable for increases in density.

the rural density transfer zone to a duly designated
receiving zone, pursuant to § 59–C–1.39.

The zoning text imposes no limitation on the ultimate densi-
ty of development possible for a property placed in the
receiving zone, but leaves this decision to the planning
process as well. Thus, by General, Master, Sector or Func-
tional Plan, the determination is to be made as to which
single family residential properties will be placed in the
receiving zone, and what limit of intensification of density
will be assigned to each property so designated.

Finally, the zoning text provides that an owner of a
designated receiving area property who wishes to intensify
development through the use of TDRs must submit a pre-
liminary subdivision plan and site plan detailing the pro-
posed development of the property. These individual plans
must conform to the development standards of the zone
permitting a density nearest to the TDR density designated
by the Master Plan Amendment. Upon approval of the site
plan and preliminary plan of subdivision, an easement is
recorded in favor of the County, restricting development of
the property or properties from which the TDRs were
obtained.

In addition to making the zoning text changes recom-
mended by the Agricultural Preservation Plan, the District
Council adopted a sectional map amendment, down-zoning
88,000 acres of land to the RDT zone, and thereby creating
nearly 17,000 TDRs.[2] It is the attempt by Appellees to
utilize some of these TDRs to achieve increased density
development of their property that has generated this con-
troversy.

---

2. The action of the District Council in down-zoning property to the
RDT zone was appealed to the Circuit Court for Montgomery County
in 1981. Affected property owners argued, among other things, that
the down-zoning amounted to a constitutionally impermissible taking
of their land, and that the text amendment establishing the RDT zone
violated the requirement of uniformity. Their appeal was unsuccess-
ful at the circuit court level, and was not pursued.

The property involved in this case is a 948 acre tract in Potomac, Maryland, known as the Avenel Farm, and owned by Rock Run Limited Partnership ("Rock Run"). Recent planning for the Avenel property has been accomplished through the Master Plan for the Potomac Subregion, which constitutes an amendment to the General Plan for the County. This Master Plan was approved by the District Council in April of 1980 and adopted by the Maryland-National Capital Park and Planning Commission in May of that year. Consideration of the residential property within this subregion for inclusion in the TDR receiving zone was accomplished through the planning process generated by a proposed amendment to the Master Plan. This amendment, ultimately adopted in September of 1982, created 27 TDR receiving areas, 13 of which were within the Potomac-Cabin John planning area that embraces the Avenel property. Each receiving area has defined boundaries, and each area has been assigned a density increase limitation, represented in this amendment by the designations TDR–1 through TDR–6. The receiving areas vary in size from 8.6 acres to 948 acres. The Avenel property was designated as a separate receiving area and assigned a density limit of TDR–2. This would have permitted the use of TDRs to increase the permissible number of dwelling units from 379 to 833 [3]. In the 1982 amendment, however, the designation of the Avenel property as a receiving area was made contingent upon the property not being utilized for an Advanced Wastewater Treatment plant ("AWT plant"). The 1982 amendment does not mention the possibility of construction of a golf course on the property.

Thereafter, Montgomery County and the Washington Suburban Sanitary Commission decided to locate the AWT plant on the Avenel Farm. Additionally, PGA Tour, Inc.

---

**3.** The Montgomery County zoning ordinance also permits a "bonus" of dwelling units where the plan includes the construction of a certain number of moderately priced dwelling units (MPDUs). One-hundred twenty-five additional dwelling units would have been possible with the utilization of the MPDUs.

advanced a proposal to construct a private stadium golf course on the property. An additional amendment to the Master Plan for Potomac Subregion was requested, and after further studies and hearings a second amendment to that Master Plan was adopted in July of 1984. This amendment, which deals almost exclusively with the Avenel property, maintained the designation of the property as a TDR receiving area with a proposed optional density of TDR–2, but removed the condition relating to the AWT plant. The TDR–2 designation allows development in accordance with the standards of the R–200 zone, as opposed to the RE–2C zone in which the property is located. The County zoning ordinance permits a density development of 2 dwelling units per acre in the RE–200 zone, but only 0.4 units per acre in the RE–2C zone.

Promptly upon the adoption of the 1984 amendment to the Master Plan, Rock Run sought approval for the TDR optional method of development of the property by filing a preliminary subdivision plan and detailed site plan. After extensive public hearings and certain revisions to the plans, the Planning Board approved the preliminary plan and site plans on October 4, 1984. The Appellants, who had participated in the hearings before the Planning Board, appealed to the Circuit Court for Montgomery County. Appellants' principal contentions were that the TDR ordinances violated the zoning uniformity requirement and improperly delegated zoning authority to the Planning Board. The circuit court affirmed the action of the Planning Board, and Appellants appealed to the Court of Special Appeals. Pursuant to petitions filed by Appellants and Appellees, we issued a writ of certiorari to the Court of Special Appeals before consideration by that court.

The principal questions presented by this appeal involve the validity of the process legislated by the District Council for the classification of properties within the TDR receiving zone and the determination of the density limitation that shall apply to each property within the zone. Appellants also present two questions relating to alleged procedural

irregularities in the granting of the preliminary plan of subdivision and the approval of the site plan. In view of the conclusion we reach concerning the substantive questions, we do not reach the procedural matters.[4]

Although important subsidiary questions are involved, Appellants' principal contentions are that the zoning authority was not validly exercised, either by the District Council itself or by any proper delegation of its authority, and that there is a lack of required uniformity within the zones designated as potential TDR receiving areas. In our view, the questions are interrelated. If there has been a valid exercise of the zoning power, there is no lack of uniformity because the effect of what has been done has been to create subclassifications of zones that afford equal treatment to all properties within them. On the other hand, if the District Council did not properly exercise or delegate its zoning authority, then the necessary zoning action is incomplete and there does in fact exist a lack of uniformity.

Appellees present alternative arguments. First, they say there was no delegation of zoning authority because the final decisions concerning the classification of property within the TDR receiving zone and the maximum permitted density for each such property, were in fact made by the District Council, albeit through the vehicle of an amendment to the Master Plan. Their alternative argument, offered in the event we find the District Council did not make the ultimate zoning determination, or did not lawfully do so, is that the Planning Board made those decisions pursuant to a valid delegation of zoning power.

We shall first address the question of whether the District Council validly exercised its zoning authority when it

---

4. Appellants also included in their petitions filed in support of their administrative appeals (later consolidated) allegations of violations of their constitutional rights, and a demand for attorneys fees and expenses pursuant to 42 U.S.C. §§ 1983 and 1988. We need not consider whether such a claim may be included in an administrative appeal because Appellants appear to have abandoned this claim, and in any event we find no violation of their constitutional rights.

approved for adoption amendments to a master plan. At the outset, we state a basic proposition that is not contested by any of the parties—that the regulation of the density and distribution of population is a part of the zoning power and ordinarily is to be exercised by the District Council. As we have previously indicated, the Legislature has defined zoning power to include the right to regulate:

(i) the location, height, bulk, and size of buildings, other structures, and units therein, building lines, minimum frontages, depths and areas of lots, and percentages of lots which may be occupied;

(ii) the size of lots, yards, courts, and other open spaces;

(iii) the erection of temporary stands and structures;

(iv) *the density and distribution of population;*

(v) the location and use of buildings and structures and units therein for trade, industry, residence, recreation, agriculture, public activities, and other purposes; and

(vi) the uses of land, including surface, subsurface, and air rights therein, for building, trade, industry, residence, recreation, agriculture, forestry, or other purposes.

Art. 28, § 8–101(b) (Emphasis added.)

In 1 E. Yokley, *Zoning Law and Practice* § 2–2, at 21 (4th ed. 1978), the author recognizes that "[z]oning ordinances are concerned with the use of property, the height of buildings and the density of population." Later, in the same section at page 25, the author states:

Intensity of use is said to be a proper element of zoning. Furthermore, it has been authoritatively stated that intensity of land use is a well recognized and valid city concern which relates to both health and safety factors and to proper zoning practice. (Footnotes omitted.)

As this Court said in *Malmar Associates v. Board,* 260 Md. 292, 310, 272 A.2d 6 (1971): "[i]t is well established that zoning to regulate density is a proper exercise of the police power."

Next, we point out the very substantial distinction between the planning and zoning functions.

A "Master Plan" is not to be confused as a substitute for a comprehensive zoning or rezoning map, nor may it be equated with it in legal signficance.... The zoning as recommended or proposed in the Master Plan may well become incorporated in a comprehensive zoning map for this area, but this will not be so until it is officially adopted and designated as such by the District Council. *Chapman v. Montgomery County,* 259 Md. 641, 643, 271 A.2d 156 (1970).

In *Howard County v. Dorsey,* 292 Md. 351, 361–62, 438 A.2d 1339 (1982), this Court said:

There is a distinction between a master plan and a comprehensive zoning or rezoning that results from a distinction between the planning function and zoning function. In *Board of County Commissioners of Carroll County v. Stephans,* 286 Md. 384, 389, 408 A.2d 1017, 1019 (1979), this Court said:

"[S]ome confusion exists relative to the terms planning and zoning, which are not synonymous. Zoning is concerned with the use of property but planning is broader in its concept. 1 E. Yokley, *Zoning Law and Practice* § 1–2 (4th ed. 1978) comments:

'Expressing the matter in another way, let us say that zoning is almost exclusively concerned with use regulation, whereas planning is a broader term and indicates the development of a community, not only with respect to the uses of lands and buildings, but also with respect to streets, parks, civic beauty, industrial and commercial undertakings, residential developments and such other matters affecting the public convenience and welfare as may be properly embraced within the police power.' "

■■ The end product of the planning function is the production of a master plan that embodies recommendations for an area's development based on predictions of needs and resources for an estimated future

period. It proposes goals for orderly growth and development including the establishment of viable neighborhoods for which it delineates appropriate boundaries. In addition, it suggests methods for implementation and achievement of those goals, including proposals for future land use and zoning classifications. The end product of the comprehensive zoning function is a comprehensive zoning map that establishes, through zoning classifications, the way in which land may presently be utilized and developed.

Similarly, in *Mont. Co. v. Woodward & Lothrop*, 280 Md. 686, 704, 376 A.2d 483 (1977), *cert. denied*, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 769 (1978), Chief Judge Murphy said for the Court that land use planning documents such as General or Master plans

represent only a basic scheme generally outlining planning and zoning objectives in an extensive area, and are in no sense a final plan; they are continually subject to modification in the light of actual land use development and serve as a guide rather than a strait jacket.

A third major premise is that the County enjoys no inherent power to zone or rezone, and may exercise that power only to the extent and in the manner directed by the Legislature. *Crozier v. Co. Comm. Pr. George's Co., supra*, 202 Md. at 505–07, 97 A.2d 296. That power has been granted to the County Council of Montgomery County, sitting as a District Council, and not to the Planning Commission or Planning Board. Art. 28, § 8–101. Thus, say Appellants, the classification and density decisions with respect to receiving area properties cannot be made by the adoption of a Master Plan because that plan is adopted by the Planning Commission and not the District Council. Appellees counter by arguing that enabling and implementing legislation places ultimate control of the Master Plan in the hands of the District Council, and thus the District Council's approval of a Master Plan constitutes the legislative decision required for the exercise of zoning power. Appellants dispute this, contending the District Council is without the

necessary authority to initiate or complete the planning process, and that in any event the planning process fails to afford due process to those who might be aggrieved by the decision. Furthermore, they contend the enabling legislation that grants zoning power to the County specifically limits the manner of exercise of that power to the adoption and amendment of the zoning text and the accompanying zoning map.

■ Because we agree with Appellants' contention that the enabling statute restricts the manner in which the District Council may exercise its zoning authority, we need not consider the question of procedural due process involved in the use of the planning process to effect a zoning decision. We will note in passing, however, that the District Council may require the initiation of a Master Plan or of an amendment thereto; that at least one public hearing is guaranteed in the consideration of any Master Plan, following 30 days notice of the time and place of hearing given in at least one publication in a newspaper of general circulation in the County; and, that no master plan or amendment thereto can be adopted without the approval of the District Council. We note also that under ordinary circumstances a hearing in this type of case would involve the determination of legislative rather than adjudicative facts, and thus there would be no requirement for a trial-type hearing. *Mont. Co. v. Woodward & Lothrop, supra,* 280 Md. at 707–13, 376 A.2d 483. *Compare Hyson v. Montgomery County,* 242 Md. 55, 217 A.2d 578 (1966). Indeed, we have suggested that the failure to provide any hearing in a legislative zoning determination may not constitute a deprivation of federal procedural due process. *Mont. Co. v. Woodward & Lothrop, supra,* 280 Md. at 714, 376 A.2d 483. Accordingly, with the possible exception of the open question of whether the District Council may compel the adoption of a Master Plan by the Commission [5]

---

5. Appellants contend that State law contemplates only the approval of a Master Plan by the District Council and vests the ultimate power of

there would not appear to be any procedural problems involved in permitting a zoning legislation decision to be made by the District Council through this type of process.

■ We conclude, however, that this chartered county is precluded, by the express and unequivocal language of the statute that granted it zoning power, from exercising that power in any manner other than that specifically authorized —namely, by the zoning map and zoning text amendment procedures. Art. 28, § 8–101(b) provides in pertinent part that:

> Each district council, respectively, in accordance with the conditions and procedures specified in this article, may by ordinance adopt and amend the text of the zoning ordinance and may by resolution or ordinance adopt and amend the map or maps accompanying the zoning ordinance text to regulate, in the portion of the regional district lying within its county ...; (iv) the density and distribution of population; .... [6]

The authority "to regulate ... the density and distribution of population" is expressly to be accomplished by adoption and amendment of "the text of the zoning ordinance" and

---

adoption in the Commission, specifying the numerical vote that is required for adoption. Art. 28, § 7–108(d)(4). Appellees point to § 33A–8 of the Montgomery County Code which requires the Commission to adopt the final draft of a plan in the form approved by the District Council. There is no question about the mandatory nature of the language of the County ordinance. The question is whether it is in conflict with existing State law.

**6.** Chapter 605 of the Laws of Maryland, 1986, effective July 1, 1986, added the following sentence to subsection (b): "The powers granted by this subsection include the power to establish a program for the transfer of development rights." Assuming arguendo that this additional sentence may be given fully retrospective application, see *Yorkdale v. Powell*, 237 Md. 121, 205 A.2d 269 (1964); *but c.f. Washington Suburban Sanitary Commission v. Riverdale Heights Volunteer Fire Co., Inc.*, 308 Md. 556, 520 A.2d 1319 (1987), the outcome of this case is not affected. The additional sentence makes it clear that the scope of zoning authority given to the District Council includes the power to establish a program for the transfer of development rights—it does not in any way change the specific direction with respect to the manner in which that power may be exercised.

adoption and amendment of "the map or maps accompanying the zoning ordinance text." Thus, where the District Council purports to act in the exercise of its zoning authority, it must do so by adopting or changing the zoning text or zoning map.

> As with all legislative grants, the zoning authority is circumscribed by any limitations established by the General Assembly in the enactment....
> *Harbor Island Marina v. Calvert Co.*, 286 Md. 303, 309, 407 A.2d 738 (1979).

Because approval of amendments to the Master Plan does not come within the mandated procedures for legislative zoning action, this process cannot constitute a valid exercise of zoning authority. Accordingly, unless the procedure employed in this case can qualify as a valid delegation of zoning authority to the Planning Board, it cannot be sustained.

This Court has recognized that the details of a carefully circumscribed zoning policy decision may be delegated to a separate agency for implementation.

> Executing the policy of a zoning ordinance is an administrative function that may be properly delegated to administrative boards or officials under specified procedural guidelines.
> *Mont. Co. v. Woodward & Lothrop, supra,* 280 Md. at 717, 376 A.2d 483.

This Court has not been hesitant to approve a delegation of legislative power where that delegation is for the purpose of implementing a prior, specific legislative determination, and is accompanied by standards sufficient to limit and direct the exercise of discretion on the part of the agency or official to whom the power is delegated. We have applied these criteria to sustain carefully limited and directed delegations of zoning authority in a variety of cases. *Mont. Co. v. Woodward & Lothrop, supra,* (designation of specific uses and densities in a central business district); *Prince George's Co. v. M. & B. Construction,* 267 Md. 338, 297 A.2d 683 (1972) (allocation of predetermined overall density

in cluster development); *Bigenho v. Montgomery Co.*, 248 Md. 386, 237 A.2d 53 (1968) (limited administrative discretion to implement legislative predetermination made by the creation of a floating zone); *Montgomery Co. v. Merlands Club*, 202 Md. 279, 96 A.2d 261 (1953) (delegation of limited authority to grant special exceptions, where legislative predetermination of compatibility has been made and specific standards are prescribed for application by the Board). Additionally, we have approved delegation to the agency administering subdivision regulations of the authority to limit density of development, where the maximum density was first fixed by the legislative body. *Coffey v. Md. Nat'l Cap. P & P Comm'n*, 293 Md. 24, 441 A.2d 1041 (1982); *Board of County Comm'rs v. Gaster*, 285 Md. 233, 401 A.2d 666 (1979). In *Coffey* and in *Gaster*, through interaction of the planning process and subdivision regulations, the legislative body delegated to the planning authority a limited discretion to *reduce* density below a specific maximum fixed by the legislative body.

■ Applying the established criteria to the facts of this case, we find the delegation of authority impermissible. No legislative determination was made to limit or define the optional densities that could or should be assigned to any property in the vast area involved. Nor did the Legislature establish precise standards by which the Planning Board might determine which properties should be placed in the TDR receiving zone, or what TDR density should be assigned to each.[7] By contrast, the Planning Board in this

---

7. We are unable to find in the Montgomery County zoning text any standards for the designation of receiving areas, or for classification of properties within the receiving areas according to optional density development opportunities. The 1982 amendment to the Master Plan recites that it followed four guidelines first recommended by the 1980 Agricultural Preservation Plan. These guidelines are very general, requiring only that: 1) the base density of receiving area property should be "reasonable from a planning perspective;" 2) the optional density assigned "should not exceed the ability of the planned public facilities to serve the area or the ability of the land and the environment to accommodate [it]," and should be "compatible with the density and uses planned for the surrounding area;" 3) property

case was given unlimited authority to select from a vast pool of residentially zoned property spread over the entire lower portion of the County, and to assign increased density potential to those properties without limitation. Although *Coffey* and *Gaster* are analogous cases in that density is ultimately controlled by the Master Plan, we see a vast difference between on the one hand permitting a Master Plan and subdivision regulations to reduce density where necessary for the orderly development of subdivisions, and on the other hand permitting an unlimited increase in density beyond that established by the legislative body.

In this case we note the absence of any effective zoning action by the District Council to generally classify properties within the TDR receiving zone. Virtually all of the single family residential properties in three-fourths of the County were declared eligible for that classification, but the ultimate decision of classification was left to the Planning Board. Additionally, there was no valid legislative action to assign different density classifications to properties within the receiving area, nor was there any ceiling on density established so as to leave the Planning Board with but limited authority to fix reduced densities. What appears to have been contemplated by the District Council in its attempts to implement the receiving area prong of the TDR concept is the creation of zoning subclassifications within the designated single family zones. These subclassifications would contain the properties approved as TDR receiving areas, grouped according to the density level assigned. This concept was accurately reflected in this case by the use

proposed for down-zoning should not be included in the receiving area, and 4) no property should be recommended for both TDR and "planned development" density options. Additionally, the 1980 Agricultural Preservation Plan noted that "[t]he purchase of development rights must be very attractive to developers. If receiving zones are well located from a marketing standpoint, and the density bonuses are sufficient to justify the purchase of development rights, the TDR concept will work." The 1982 amendment to the Master Plan lists six "plan guidelines" that were followed in the development of the plan, but these guidelines cannot take the place of standards established by a legislative body.

of the TDR–1 thru TDR–6 classifications assigned by the Planning Board. Proper implementation of that structure would result in uniformity of zones, and informative identification of the precise classification of the property on the zoning map. By way of example, every property that is zoned R–200 and approved as a TDR receiving property with an optional density value of TDR–2 would be in the same zone, and each would be identified on the zoning map as R–200 TDR–2. This is the practical effect of the implementation attempted by the Planning Board—an attempt that failed because the Board lacked the requisite zoning authority. We do not suggest that this is the only method by which the desired end might be attained. Rather, we outline the structure that was employed to identify its flaws.

The major deficiency in this entire process is the absence of the final step in the planning and zoning process—the amendment of the zoning map, and where necessary the zoning text, to implement the changes recommended by the Master Plan. Certainly comprehensive planning should form an integral part of the process of identifying TDR receiving areas and assigning density classifications. Once the planning has been accomplished and the recommendations made, however, it becomes the duty of the legislative authority to make any necessary changes in the zoning law. Ordinarily, these changes are accomplished through a sectional map amendment, which once proposed enjoys a strong presumption of validity and correctness, and requires no showing of change or mistake.

These deficiencies, although perhaps easily remedied by appropriate changes in the zoning text, are fatal to the designation and classification of TDR receiving areas in this case.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE SO MUCH OF THE DECISION OF THE MONTGOMERY

COUNTY PLANNING BOARD AS PERTAINS TO THE CLASSIFICATION AND DETERMINATION OF DENSITY LEVELS OF PROPERTY WITHIN THE TRANSFERABLE DEVELOPMENT RIGHTS RECEIVING ZONE. COSTS TO BE PAID BY APPELLEES.