14 A.3d 1266

**POMERANC–BURKE, LLC**

v.

**WICOMICO ENVIRONMENTAL TRUST, LTD., et al.**

**No. 2492, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

March 2, 2011.

Raymond S. Smethurst, Jr. (Robert B. Taylor, Matthew T. Mills, on the brief), Salisbury, MD, for Appellant.

Maureen F. Lanigan & Michael A. Pretl, Riverton, MD (Edgar A. Baker, Wicomico Department of Law, on the brief), Salisbury, MD, for appellee.

Panel: JAMES R. EYLER, GRAEFF, JAMES P. SALMON, (Retired, specially assigned), JJ.

EYLER, JAMES R., J.

Pomeranc–Burke, LLC, appellant, applied to the Wicomico County Planning & Zoning Commission (the "Commission") for approval of a preliminary plat for a "cluster subdivision" (the "subdivision") called "The Woodlands at Whiton" ("Whiton") to be developed on a site in the A–1 "Agriculture–Rural" zoning district, which site was being utilized for crop and timber production in a rural area of the county (the "Property"). On October 16, 2008 and November 20, 2008, public hearings were held with regard to the proposed subdivision, at which testimony and documentary evidence were presented. Following the November 20 hearing, the Commission voted to deny the preliminary plat for the subdivision, "with findings of fact to be determined at a later date." Subsequently, on December 18, 2008, the Commission adopted a "Resolution of Decision and Findings of Fact," setting forth its reasoning for denying the Whiton subdivision.

On or about December 31, 2008, appellant appealed the Commission's denial to the Wicomico County Board of Appeals (the "Board"). The appeal was opposed by the Wicomico Environmental Trust, as well as several intervenors. On February 26, 2009, the Board held an "on the record" hearing,

and reviewed the proceedings, testimony, and evidence from the Commission hearings, and affirmed the Commission's decision. On April 13, 2009, the Board rendered written "Findings of Fact and Resolution," adopting and incorporating by reference the Commission's findings of fact.

On May 11, 2009, appellant petitioned to the Circuit Court for Wicomico County for judicial review. Wicomico Environmental Trust, Ltd., Charles Shank, Jr., Mark and Lisa Wagner, and Audubon Maryland, DC, intervenors before the Board, as well as Wicomico County, Maryland, appellees, all responded to and indicated their intention to participate in and oppose appellant's petition. On October 9, 2009, the circuit court heard oral arguments, and on November 6, 2009, the court issued a written opinion and order affirming the Board's decision. This appeal followed.

On appeal, appellant contends [1] that (1) a "cluster subdivision" such as it had proposed, is an "inherently permitted use in the A–1 zoning district" [2] as adopted by the County legislature pursuant to Wicomico County Code ("Code") § 225–52, which section specifies "clear, objective and unambiguous criteria for an A–1 cluster subdivision"; thus, (2) the Commission did not have the administrative authority to deny appellant's application for such use on the basis that the use did not comply with the "general purpose provisions" in Code §§ 225–27 A or 225–51 A, and the Commission "misconstrued and exceeded its authority" by applying the "general purpose provisions" in "order to promote their personal bias against residential development" on the Property; and, (3) the Com-

---

1. Appellant presents the questions as:
   I. May the Planning Commission apply nebulous vision and general purpose provisions to deny approval of a subdivision that meets the unambiguous statutory criteria for that inherently permitted use?
   II. Were the findings of the Planning Commission and the decision based thereon supported by any evidence whatsoever?

2. Single-family detached dwellings are a permitted use in the A–1 zone. Code § 225–67, table of permitted uses. A cluster form of development is governed by the Code references discussed in this opinion.

mission's findings were unsupported by "any evidence," and, in any event, did not support its denial of appellant's proposal.

We shall affirm.

## Factual Background

### 1. *The proposed Whiton subdivision site*

The Property consists of a 519.12–acre tract located in the southeastern corner of Wicomico County abutting Worcester County to the south. It is situated on the west side of Whiton Road, a.k.a. Maryland Route 354, (hereinafter "Route 354") and the southwest side of Powell School Road. According to appellant, the Property is located near the village of Powellville and is approximately 7 miles from the town of Willards, 11 miles from the town of Berlin, and 15 miles from downtown Salisbury. The Property consists of two adjoining parcels, parcels 11 and 64. The parcels are completely forested, with the exception of a 25–acre cultivated field fronting on Route 354. Other than the 25–acre field, the Property is currently, and has been since at least 1929, used for timber growing.

Running through the southwesterly portion of the Property and constituting its southwesterly boundary is a ditch and/or stream called Davis Branch. The westerly portion of the tract consists of two ridges of high, dry, sandy soils on which logging roads exist. The remainder of the Property is at a lower elevation and is characterized by wetter, hydric soils, including areas of nontidal wetlands, making it unsuitable for development, but capable of supporting timber production.

### 2. *Subdivision development regulations on the proposed Whiton site*

#### a. *The Comprehensive Plan*

Pursuant to the February 3, 1998 Wicomico County Comprehensive Plan (the "Comprehensive Plan" or the "Plan") land use map, the Property is located in what is designated as an Agricultural/Forest Resource Area and in the A–1 Agriculture–Rural zoning district. The Plan is an "official statement of the County Council setting forth policies concerning desir-

able future physical development" in the County, "serves as a general guide to public and private development decisions," and is "the basis for the preparation of specific legislation, such as zoning and subdivision regulations . . . which implement the policies set forth in the Plan." The Comprehensive Plan envisions that development will be concentrated in suitable areas, that sensitive areas will be protected, and that growth will be directed to existing population centers.

Chapter 2 of the Comprehensive Plan, "Land Use," sets forth the overall development concept principles and policies concerning Agriculture/Resource areas:

> The Agricultural/Resources Area designation is intended to prevent developments that require urban services, and to preserve the agricultural base and rural lifestyle of the County. Most land devoted to farming and nearly all public drainage associations, which are formed to drain agricultural land, are within the Agriculture/Resource area. The primary land uses in these areas should be agriculture, forestry and related activities.

That section also indicates that "[c]luster development is the preferred form of land subdivision to avoid land use conflicts and maintain or enhance rural character."

With respect to residential land, the policies section provides that in "keeping with the general development policies of the County," "[a] variety of housing and development types and locations should be encouraged to provide a mixture of living environments," and specifically, "[c]luster design and planned unit developments should be encouraged."

In chapter 9, "Implementation," with respect to the Agriculture/rural District, the Plan provides:

### Agriculture/Rural (AR)

> The District is comprised most[ly] of that land previously describe[d] as rural residential. The purpose of the Agriculture/Rural District is to preserve agricultural lands, forests, environmentally sensitive areas and open spaces while preserving the fundamental rights of landowners to utilize

these lands for either resource-based uses or low-impact residential development.

* * *

The AR District will assist in preserving open areas of the County as areas for development of active or passive outdoor recreation use. Through carefully implemented design standards it will protect existing natural resources.... This district includes areas naturally unsuited for intensive development adjacent to all of the County's waterways (generally coinciding with the limits of the 100–Year Floodplain or the natural floodplain of all waterways), streams and their buffers, the habitats of threatened and endangered species, designated "greenways," the Critical Area Buffer....

* * *

Landowners in AR districts are guaranteed choices about how to man[a]ge their land. The preferred use of land in the Agriculture/Rural District is for sustainable resource protection. However, other development is permitted in a manner that minimizes negative impacts on existing resources and allows a substantial economic return for the landowner. This is accomplished by the creation of cluster development densities and standards.

Because a primary design consideration in the Agriculture/Rural areas was "retaining and/or enhancing rural character," the Plan also recommends that the zoning ordinance "strongly encourage cluster development in the rural district." Furthermore, the Plan recommends that as "an incentive for 'clustering' development to retain areas of open space ... a bonus or incentive density be established."

### b. *The Code*

Article 25 A of the Maryland Annotated Code (1957), provides Wicomico County with the authority to establish rules and regulations regarding the subdivision of land in the County. Chapter 200 contains the subdivision provisions. Chapter 225 of the zoning Code sets forth the County zoning provi-

sions. Of particular relevance here are the following provisions.

Section 225–3, which is found in Article I, "Purpose and Authority," defines the "Intent" of the zoning Code.

A. The Zoning Regulations and Districts herein set forth and as identified upon the Zoning Map of Wicomico County are made for the purpose of promoting the public health, safety and general welfare and prescribing the most desirable use for which land in each zoning district may be adapted and those uses to be subjected to special regulations, while conserving the value of land throughout the county. The height, bulk and location of buildings and other structures, the area of yards, courts and setbacks and other open spaces, the density of population and intensity of use of buildings and land, the use and conservation of waterfront areas, and the use of structures and land for residential, commercial, industrial, institutional or other purposes, are hereby restricted and regulated as hereinafter provided.

B. Such regulations have been designed to preserve open space, protect the Chesapeake Bay, lessen congestion in the streets and preserve agriculture. They have been made with reasonable regard, among other things, to the character of each zoning district and its suitability for particular uses as well as the preservation of the natural environment throughout Wicomico County.

C. All such zoning regulations and the Zoning Map shall be enacted for the purposes of:

* * *

(1) Preserving and promoting the health, safety and welfare of the citizens of Wicomico County;

(2) Guiding the future growth and development of the county generally in accordance with the Wicomico County Comprehensive Plan in a manner which results in the most beneficial land use relationships among residential, nonresidential and public areas;

(3) Providing for the orderly growth and development of the county in a manner which will protect, conserve and stabilize the value of land, structures and neighborhoods;

(4) Providing adequate light, air and privacy of building areas and lots, securing safety from fire and other danger and preventing overcrowding of land and undue congestion of population;

(5) Providing for coordination between the use of land and structures and the street and highway system in order to avoid congestion in the streets and to promote safe and convenient traffic circulation;

(6) Regulating and coordinating development activities to provide for the adequate provision of public facilities and services;

(7) Providing for a variety of housing types in diverse living environments within the income levels of county citizens;

(8) Providing open space to protect the archaeological, historic, scenic and natural features of the county, as well as providing recreation spaces for existing and future citizens;

(9) Preserving farmland and the agricultural land base.

(10) Protecting and preserving the archaeological and historic features of the county, including human burial sites.

D.  It is also the objective of this chapter to implement the eight visions contained in the Maryland Growth Management, Resource Protection and Economic Development Act of 1992, as amended, in order that:

(1) Development is concentrated in suitable areas;

(2) Sensitive areas are protected;

(3) In rural areas, growth is directed to existing population centers and resource areas are protected;

(4) Stewardship of the Chesapeake Bay and the land is a universal ethic;

(5) Conservation of resources, including a reduction in resource consumption, is practiced;

(6) To assure the achievement of Subsection D(1) through (5) above, economic growth is encouraged and regulatory mechanisms are streamlined;

(7) Adequate public facilities and infrastructure under the control of the county or municipal corporation are available or planned in areas where growth is to occur; and

(8) Funding mechanisms are in place to achieve this policy.

E. *The statement of intent and visions contained in this section shall provide the basis for consideration of all zoning forms of action as may be required of staff, the Planning and Zoning Commission and the Board of Appeals by this chapter.*

(Emphasis added).

Section 225–25 B defines a "cluster development" as a "planned residential tract, subdivision or area where individual lots and/or buildings are arranged in clusters or groups, where access is gained entirely by internal streets, with open areas between such lots or building groups, which areas are either publicly or privately owned and maintained in a park-like appearance." Section 225–25 B also defines "contiguous" as a "land mass, lot, or parcel of property that is cohesive and without interruption by nonintegrated or fragmented property lines."

Chapter 225, Article 27 is entitled "Resource Conservation Districts," and provides the following:

### § 225–27. A–1 Agricultural–Rural District.

A. *Purpose. The purpose of the A–1 Agriculture–Rural District is to preserve areas of the county that are predominantly agricultural and to maintain the land base necessary for sustainable agricultural activity.*

(1) This district is designed to protect agriculture from incompatible residential, commercial and industrial development.

(2) Where low-intensity residential development is allowed in the Agriculture–Rural District, density and design

standards shall ensure natural resource protection and preservation of rural character.

(3) This district shall be characterized by a mix of agricultural activities, farms and farmland, forests, open spaces and low-intensity residential development or small cluster developments with significant associated open spaces.

B. Permitted uses. The permitted uses shall be those specified in the Table of Permitted Uses, § 225–67.

C. Development options. An A–1 Cluster Development is available by approval of a development plan.

(Emphasis added).

Section 225–67 specifies that permitted uses in an A–1 district are, *inter alia,* libraries, museums, places of religious assembly, bus depots, and single-family detached dwellings. There are other uses that require a special exception, including sawmills, barbershops or beauty salons, private clubs, golf courses, bed-and-breakfasts, and two-family dwellings.

Section 225–51 sets forth the "general requirements" for "cluster developments."

A. *Purpose. The purpose of this section is:*

*(1) To encourage innovative and creative cluster design of residential developments.*

*(2) To encourage more efficient use of land and services in order to reduce construction and maintenance costs, reflect changes in technology in land development and minimize the operating costs of service delivery and utility systems.*

*(3) To preserve agriculture lands and enhance the rural atmosphere and visual character in the county.*

B. Types of cluster developments. The types of cluster developments that *may be approved* are as follows:

(1) A–1 cluster development.

(2) Residential cluster development.

C. Review of proposed cluster development. The subdivider shall submit a plan consistent with the provisions of Chapter 200, entitled "Subdivision of Land," for a cluster

development to the Planning Director for review and comment and to the Planning Commission for its review and final action as follows:

(1) The application for a cluster development shall include a plan, which shows the uses proposed for the entire development.

\* \* \*

(Emphasis added).

Section 225-52 outlines "A–1 cluster development[s]."

A. Where applicable. Cluster development *may be permitted* in the A–1 Agriculture–Rural District, for residential cluster purposes, subject to the standards contained in Subsection F hereof, entitled "Development standards."

B. Applicability and minimum land area requirements. A proposed A–1 cluster development shall be eligible for consideration under the provisions of this section only if the following requirements are met:

(1) The applicant shall have legal or equitable title to the property or shall otherwise have a legally documented financial interest in the real property which is the subject of the application.

(2) The proposed development shall contain the necessary contiguous acres that may be divided by a road or stream wholly located with [sic] the A–1 Agriculture–Rural District.

C. Permitted density. The following rules apply in A–1 cluster development:

(1) The maximum density permitted shall be as established in the Schedule of Maximum Permitted Residential Densities.

D. The minimum open space area required in an A–1 cluster development shall be 50% of the gross site area.

E. Other requirements.

(1) To the greatest extent possible, cluster open space shall include:

(a) Streams and stream buffers;

(b) Known habitats of threatened and endangered species;

(c) The most productive agriculture land;

(d) Steep slopes;

(e) Nontidal wetlands and their buffers; and

(f) Riparian forest buffers (measured 50 feet from streams and watercourses).

(2) Required open space may be retained by the landowner or sold. Agriculture and/or forestry uses may continue on the open space.

(3) Cluster open space shall be protected by legal arrangements satisfactory to the County Attorney or its designee to assure maintenance and preservation of open space for its intended purpose.

F. Development standards.

(1) The setback requirements shall be as stated in Part 7.[3]

(2) Vegetated buffer: 50 feet between development areas and any adjacent agriculture use or activity.

(3) All lots shall front and have access on an interior street system.

(Emphasis added).

The "Schedule of Maximum Permitted Residential Densities," § 225–75 of the Code, provides that in a "conventional" residential subdivision in an A–1 district, a minimum lot area per dwelling unit is 15 acres, but in an A–1 "cluster" subdivision, there is a "bonus" minimum lot area of 3 acres per dwelling unit.

Chapter 200, "Subdivision of Land," outlines the procedure to be followed in the denial of preliminary plats in § 200–7, "Preliminary Plats":

H. Denial of preliminary plats. The Planning Commission may deny approval of any preliminary plat of the subdivi-

---

**3.** § 225–70. We need not reproduce the text of that section here as it is not relevant to our analysis.

sion of land if, after investigations conducted or recommendations by the public agencies concerned, it is determined that one of the following factors exists in regards to the subdivision:

(1) The land is subject to flooding or is topographically unsuitable for residential occupancy or for such other use and the development or occupancy of which may increase the danger to health, life, property or aggravate erosion or flood hazard to future occupants or the general public;

(2) Inadequate drainageways or public accessways exist, either on-site or off-site, to serve the proposed development;

(3) A subdivision is proposed without frontage on a governmentally owned or maintained street or road;

(4) The Health Department has determined that the soils on the site or the water supply serving the subdivision is contaminated and development would pose a danger to the health and safety of the public;

(5) The layout of the lots are such that intensive development of the site will create a safety hazard to the future residents of the subdivision or to the general public;

(6) The proposed subdivision will not meet the floodplain regulations in Chapter 149, Floodplain Management; or

(7) The proposed subdivision does not meet the requirements of this chapter and the applicant is unable to receive a waiver or a variance.

Section 200–8(E) is identical to § 200–7(H), except that § 200–8(E) relates to the denial of final, rather than preliminary, plats.

Section 200–13 B, "Lots," provides that the "size shape and orientation of lots shall be such as the developer deems appropriate for the type of development and use contemplated, subject to the approval of . . . the Planning Commission." Section 200–13 B(7) provides that "[a]ll parcels in a cluster subdivision, except the residual parcel, shall be grouped together and contiguous." We will include additional Code sections as is necessary in our discussion.

### 3. *The proposed Whiton subdivision development*

In April of 2007, the Commission reviewed a "sketch plat" for the proposed Whiton cluster subdivision. The Commission had previously reviewed sketch plats for the Property in January of 2005, June of 2006, and January of 2007. The April of 2007 sketch plat proposed a subdivision of 188 lots on 562 acres. In October of 2007, another sketch plat was reviewed for 143 lots on 527 acres, with the lots averaging approximately 1.2 acres each. The Commission noted that the Property in question was zoned A–1. After reviewing the proposal and Code § 225–51 A, the Commission concluded that "[p]ermitting a subdivision of this density will forever change the rural landscape and character of the region. By introducing this heavily populated subdivision, demands will likely be placed on the County to allow commercial, retail, medical and food service providers to the region." Thus, the Commission's consensus was that if appellant chose to submit a preliminary plat, "a density of one unit per fifteen acres is preferable to use of the cluster provision in the manner proposed."

In reaching its consensus, the Commission also cited to an enclosure, dated October 5, 2007, appended to an October 12, 2007 letter to the Commission from the Maryland Department of Planning ("MDP") in which the MDP objected to the Whiton subdivision proposal stating that it "is inconsistent with the County Zoning Code, the subdivision ordinance, the Comprehensive Plan and State Planning policy"; thus, the Commission should reject the proposal.

Subsequently, the Department of Public Works ("DPW") reviewed a "preliminary plat" submitted by appellant. The preliminary plat proposed a subdivision of 147 lots on 166.82 acres. The plat provided for approximately 352.30 acres of open space, and 14.68 acres was to be dedicated for new roads. The total acreage of the Property was 519.2 acres. The DPW recommended Commission approval of the subdivision subject to certain proposed conditions.

The preliminary plat was reviewed by the Commission, and a "County Subdivision Analysis" was prepared by Commission staff. The information contained in that document and from the preliminary plat indicates that appellant contemplated that the subdivision would contain 147 lots on the 519.2 acre tract. All lots would front and have access on new interior streets consisting of 14.68 acres. The lots would average 1.04 acres in size, and 352.30 acres would remain undeveloped as forested set-aside and open space area. Furthermore, the agricultural area would remain in agricultural use. The access to the subdivision was proposed to connect to Powell School Road, a "Minor Collector Road." The proposed entrance would require "substantial road improvements."

The analysis also noted that "a subdivision at a density of one unit per 15 acres (the Rural Base Density) would be preferred for this rural area." Further, the analysis noted that the site was within a "Green Infrastructure Hub," which was identified by the Department of Natural Resources ("DNR") as "one of the most ecologically sensitive Green Infrastructure areas."

The analysis included a review of the MDP's comments in its prior report, and observed that the MDP had noted "a number of issues with this proposal," including that the proposal "will not help to preserve agricultural and forest lands and will further fragment lands available for farm and timber production," and the proposed development "increases the probability of conflict between rural resource-based activities (farming and forestry and their related activities) and residential enclaves." The Commission staff, noting that it shared the concerns previously noted by the Commission and the MDP for any development in "this isolated rural area," recommended preliminary plat approval for the Whiton subdivision, stating the following:

> The land area currently in active agricultural production is to remain in agricultural production. The proposed subdivision is located near the northeast border of the property and a portion of the lots are not within the Green Infrastructure area. The subdivision has been designed so that

68 percent of the property will remain in open space. Although a significant investment will be required for road improvements and road construction and there will be significant costs for future road maintenance and service delivery, the applicants have designed the subdivision to minimize these costs as much as possible. The location of the lots back from Powell School Road will minimize impacts on surrounding agricultural operations and will and will also minimize the visual impacts of those operations on the subdivision.

### 4. *Commission proceedings*

#### a. *October 16, 2008*

At the start of the proceedings, Gloria Smith, the Commission's staff planner, presented the proposed Whiton subdivision. She began by briefly reviewing the County Subdivision Analysis, which included comments submitted by the MDP in its October 5, 2007 staff report and October 12, 2007 letter to the Commission. We shall pause here to set forth portions of those documents.

In its October 12 letter, the MDP expressed its "concerns" with the Whiton subdivision, repeatedly indicating that the proposal was contrary to the Comprehensive Plan and failed the "purpose test":

> About 341 acres of the site are to be preserved as open space and thereby protected from direct development activity. The open space will be divided into three somewhat discontinuous blocks of land.
>
> * * *
>
> It appears that all of the currently farmed land will be converted to residential lots.
>
> * * *
>
> [T]he proposal is inconsistent with the intent of both State and local plans and policies, and will compromise State and County investment in rural land and resource conservation easements in the surrounding area. The greatest concerns

from among those discussed in the enclosure [i.e., the October 5, 2007 report] appear to be the apparent inconsistencies between the magnitude, location, and design of the development project on the one hand, and the goals and intent of the County Comprehensive Plan and zoning ordinance for the A–1 Agricultural District.

With respect to magnitude and location, 143 dwellings seems a formidable residential presence in a part of the County's Agricultural–Rural District that is both fairly remote from County growth areas and adjacent to an analogous part of Worcester County's agricultural district. A development of this size appears incongruent with County objectives for working rural landscapes in the A–1 District, an area whose primary land uses, as identified in the Comprehensive Plan, are agriculture and forestry. These proposed units will intrude severely upon rural land use and character, both on-site and in the surrounding area.... MDP is not able to provide any convincing rationale to suggest that these impacts, so contrary to the objectives of the County Plan, could be avoided for such a large development in such a location.

With respect to the design of the site, the project will not preserve a relatively large, contiguous land area with the best soils and woodland resource features, and more important, will not lend itself to future agricultural or forestry use.

* * *

... [T]he fragmentation of the property by residential enclaves will greatly compromise farm and forest uses for the remainder of the site.... This outcome, counter to the intent of the County's Plan and the purpose of the A–1 zoning district, would seem difficult to avoid given the number of units proposed, no matter the site design.

Given the magnitude, location, and site considerations, it is not surprising that the proposal lacks the design features for cluster developments in the A–1 District that are indicated in the purpose statement of the county zoning ordinance. Specifically, given the number of lots to be concen-

trated in a single development site, it would be difficult to design a project that would "... protect agriculture from incompatible residential ... development," and which would qualify as a "small cluster development with significant open spaces" compatible with the purposes of the A–1 District articulated in the ordinance and the Comprehensive Plan. ... [The MDP] recommend[s] putting an emphasis on consistency with the intent of the County Plan and the zoning ordinance. [C]onsistency with county plans, State Planning Policy, and county intent for zoning districts ... should always play an over-arching role in local decision-making about development proposals. The intent articulated in these plans and ordinances represents publicly established purposes, and these are the purposes to be served through administration of development review and approval processes.

The attachment, the October 5 report, provided more of the same sentiments:

[The proposed subdivision] is located in a portion of the A–1 District that is far from any County Priority Funding Area or planned development area ...

\* \* \*

This district is designed to protect agriculture from incompatible residential, commercial, and industrial development. Where low-intensity residential development is allowed in the Agricultural–Rural District, density and design standards shall ensure natural resource protection and preservation of rural character.

\* \* \*

It is our view that the proposed development is not consistent with the County's zoning guidelines for cluster development in the A–1 District. Though much smaller in terms of the number of households and population than previously proposed for this site, and despite its label as a cluster development, the proposal is not a "low intensity residential" or "small cluster development with significant open spaces."

\* \* \*

[I]t does not concentrate a small enough number[ ] of lots to be un-intrusive upon surrounding rural land use and character, on a minimum amount of land; and does not preserve a relatively large, contiguous portion of the site with the best soils and other resource features in a configuration that lends itself to future agricultural or forestry use. It therefore does not meet the purpose-test of the County's zoning code for the A–1 District, nor is it compatible with much of the intent of the zoning guidelines for cluster development.
\* \* \*

In addition, the development plan does not preserve agricultural land and enhance rural atmosphere and visual character. Rather ... it will compromise the resource attributes of the site and its immediate surrounding, and serve as a shift in County procedure away from support for the two central visions of State Planning Policy,[4] which are also objectives of the County Comprehensive Plan: to concentrate development in suitable areas and protect resource lands. Upholding these visions is part of the intent of the County's zoning code and the County's Subdivision Ordinance, and this development proposal does not do that.
\* \* \*

... [I]t is clear ... that the proposal is inconsistent with County zoning code, the subdivision ordinance, the Comprehensive Plan, and State Planning Policy, and that the County Planning Commission should reject the proposal accordingly. To be consistent on all of those counts, the developer would have to reduce the scope and nature of the project, and modify its configuration, so it would legitimately be a small cluster development that would not substantially change the land use and rural character in the area, and would leave the majority of the best soils and woodland

---

4. *See* Maryland Code (1957, 2003 Repl.Vol.), Art. 66 B, § 1.01, which section sets forth the "visions" that a commission must implement when revising comprehensive plans. Those are encompassed in Code § 225–3 D(1–8), *supra.*

acreage in a large, contiguous remainder capable of supporting farming or forestry.

The following then transpired at the October 16 hearing, in relevant part. Appellant took the position that it was "entitled to a cluster development if [it] me[ ]t the criteria for a cluster development," which, in appellant's opinion, the proposed subdivision did. Appellant argued that it had changed the design on the development to comply with the MDP's concerns, including its concern that the agricultural land would not be developed, and that as long as the proposal was in compliance with the "cluster code," it must be approved.

Appellant's engineer, Brock Parker, explained that the proposed subdivision was "one contiguous," albeit "large," development. He explained that the 147 lots were to be concentrated on the high, sandy, dry soil on the Property, and that approximately 65%—which far exceeded the 50% requirement—would be set aside for forest conservation. He stated that the soil that would be developed was not as good for timber growing as the set aside soil.

Appellant also opined that by "pushing . . . back" the development to where it could not be seen from the road, the development preserves the "rural atmosphere" and comports with "the whole cluster idea." Appellant argued that there would necessarily be some fragmentation of the forested area, but that the majority of the woodlands were preserved. Appellant argued that 350 acres were being given to the County, and that it would not cost the County any money. The Commission Vice–Chair responded that it would cost the County money because the County would have to upgrade Powell School Road, and "that could be a big deal." Moreover, he stated that it would be a "shame" to lose "this beautiful tract of woods."

The Commission Chair brought up the fact that there were two "Green Infrastructure" hubs on the Property, which hubs "play a role in preservation of . . . ecologically sensitive land," and that appellant did not know exactly where they were located. Appellant responded that the Property could not be

developed without intruding upon the hubs, and that there was "no requirement for any mitigation." A Commission member responded that perhaps the Commission could not refuse appellant the right to develop because of the hubs on that basis, but that it could refuse appellant the "density bonus." The Commission member also stated that "we have a moral obligation to, if nothing else, to protect our environmental resources." Appellant maintained the position that it had "a right to the one in three" density bonus, "if we meet the criteria." The Commission Chair proposed that the proposal be tabled until "such time that [appellant] can come back with this information," regarding the Green Infrastructure hubs, "and any other questions" and concerns from the MDP "that were left from the sketch plat that have not been answered." A Commission member stated that he "think[s] it's the wrong project in the wrong area for a lot of reasons," and stated that the proposal "is a poster child for why ... a development shouldn't occur in a rural area." He also stated that "it flies in the face of every good land use policy in the County and in the State of Maryland." Appellant responded that while "that's very philosophical ... we're dealing with a code .... [and] the zoning code is not a matter of philosophy, it's a matter of what you can do ... and ... what you can't."

Also appearing at the hearing was an attorney for Wicomico Environmental Trust, certain adjacent property owners, and Audubon Maryland—DC. He explained that the Audubon Society had done "some serious research over the last year," and had declared the Property an "IBA, an important bird area." Counsel put in the record the Audubon Society's report, which report indicated that the IBA, covering 180,878 acres in the Pocomoke–Nassawango area of the lower Eastern Shore, and encompassing the Property, "is the largest bird area in the state," and is the "premier site for 12 at risk bird species." He continued that of "24 species of ... forest dwelling species on Maryland's coastal plain, 21 of them are at this site." Counsel explained that the green infrastructure was meant to protect wildlife species by setting aside a sufficient area to allow the species to flourish. He reiterated

that "this is the worst place in the world to have this" development, and would "open up one of the last protected areas" in the County.

At the conclusion of the proceedings, a Commission member voted to deny approval, but ultimately the discussion was tabled "to get the green infrastructure information together and to hear from Maryland State Planning."

### b. *November 20, 2008*

On November 20, the tabled preliminary plat discussions were resumed. At the November 20 hearing, the following transpired, in relevant part.

Appellant stated that after the October 16 hearing, appellant retained Matt Hedger, an environmental consultant, to evaluate the area. Mr. Hedger testified that he did not observe any endangered or threatened species of birds "while [he] was on-site."

Appellant also presented the testimony of its land planner and engineer, Mr. Parker. Mr. Parker testified, again, that the proposed subdivision was to be built entirely on the "sandiest soils." He stated that the plan included "adequate stream buffers as required by the code," and that the nearest lot would be "probably ... 350 feet away from the road and ... separated by a wooded buffer." The only entrance into the site would be a "dual lane entrance road," i.e., "two 15–foot wide travel lanes separated by a wooden median." He explained that the houses in the subdivision would not be seen from the entrance. Mr. Parker testified that the land with the most productive agricultural and timber-growing soil would not be developed.

Mr. Parker testified that the plan included 50–foot wide vegetative stream buffers in the open space, on either side of Davis Branch. He also stated that the entire stream on the Property was within the set-aside, and that the total acreage of the open space comprised 68% of the site. One of the Commission members expressed concern regarding emergency services, stating, "[w]hat's going to happen if you have a

fairly severe fire at that farthest point? ... [I]f you have a fire back there, it would be a problem. You got just the stream to draft water out." Mr. Parker responded that "Yeah. It's not much of a stream now...."

Another Commission member stated,

... a development in this area is probably the worst example I can think of of allowing a subdivision in a rural area.... And as far as providing services to it, I don't ... think that we probably couldn't get anywhere further in the county away from schools, away from health care, away from shopping, all the necessary amenities that people normally use to do their business and to exist.

Again, I know it's been talked about regulation. I know [appellant] has been very adamant about that, about the green infrastructure ... right now it's for agricultural production.

* * *

And I'm going to go out on a limb here and say, just because the regulations say that X, X and X, that means that it's the right thing to do. I, in good conscious [sic], don't believe it's the right thing to do, and I'm not going to support moving this forward....

A representative from the MDP explained that the MDP had been "commenting on this particular subdivision since 2006," and that it was opposed to the development. The contents of a November 19, 2008 letter from Richard Hall, Secretary of the MDP, was presented. In that letter, Mr. Hall opined that the proposal continued to be inconsistent with the County Plan, with State planning policy, and with the County's intent for the A–1 District. The MDP representative paraphrased Mr. Hall's letter:

This area will not only compromise this particular site, but also state and county investment and rural land and the surrounding area. And as we mentioned before, even Worcester County, which this property borders ... has in their comprehensive plan a designation of green infrastructure bordering this property. So it's very clear that the

intent . . . was, in Worcester, this would remain a very rural area. And that's what we believed was also the intent of Wicomico County.

Our greatest concerns are with the apparent inconsistencies between the magnitude of this development, its location and also the design of the development with respect to the goals and attempts of the county plan and county zoning and subdivision regulations.

MDP isn't able to provide any rationale that would be convincing that would say that you're not going to experience adverse impacts in this area as a result of this development . . . .

\* \* \*

We think in particular this development is completely contrary to some of the stated visions . . . of the state planning policy, number one—vision one—being that development is being concentrated in suitable areas. Vision two, that sensitive areas are protected. Vision three, that in rural areas, growth is directed to existing population centers and resource areas are protected. And vision seven . . . that adequate public facilities and infrastructure under the control of the county are available or planned in areas where growth is to occur, not create the growth and then we'll pay for the infrastructure to follow it. . . .

Also in Section 225–27 of the code . . . this is the purpose section of A–1 district. It states that this district is designed to protect agriculture from incompatible residential, commercial, industrial development. Key also, to allow low intensity residential development that ensures natural resource protection and preserves the rural character.

So . . . if you can't use the intended purpose of the zoning ordinance in your consideration, we would . . . then argue that . . . . even though . . . there is a significant amount of open space for this development, it's been provided in this disaggregated manner which would not lend itself to any future use for our agricultural or forestry uses.

And we would offer that the Woodlands At Whiton is not defined as a small cluster development, but rather, it's three noncontiguous groupings of lots with about a third of those 147 lots designed in a linear fashion that's more akin to stip style development than it is cluster development.

. . . [T]he fragmentation of this property by residential enclaves will greatly compromise farm and forest uses for the remainder of the site. The design flaw is counter to the intent of the county plan, the A–1 zoning district and the cluster provision of the subdivision regulations. And given the magnitude, location and site considerations, it is not surprising that the proposal lacks the design features and vision for cluster developments in the A–1 district.

It is our hope that when you conduct this review that you'll exercise your discretionary authority to reject this proposal. And furthermore, if it was to be developed, that it be done so at the one per 15 density.

And that our other recommendation would be that it seems as though there's no consideration being given between some range between one per 15 and one per three. Wouldn't it make more sense to look at a more appropriate design where you are considering length of roadways and lot configuration and the true clustering of lots and maybe come up with . . . some other clustering density other than one per three and not try to max out the site necessarily?

Appellant responded that the question is only whether the proposal "satisf[ies] your code, and it does." The Commission then denied the preliminary plat with findings of fact to be determined "at a later date." One Commission member opposed the denial, stating that she thought "it meets our current zoning code and our subdivision regulations."

### 5. *Commission decision*

In its "Resolution of Decision and Findings of Fact," the Commission made the following nine findings, all of which are disputed by appellant:

"1) The Commission is permitted to exercise its discretion in evaluating said Cluster Development criteria, in accordance with the principles and purposes set forth in Section 225–51." The Commission concluded that the subdivision did not meet the "purpose" of a cluster development, finding that it "could more accurately be described as several clusters, rather than a single cluster subdivision," and that the lot and street arrangement would make future timber harvesting on some of the remaining undeveloped areas difficult.

"2) The applicant had not adequately demonstrated to the satisfaction of the Commission that the proposed number and layout of lots and associated roadway, constitutes a Cluster Development, consistent with the principles, purposes, and criteria outlined in Sections 225–51, 225–52, and 225–27 A." The Commission found that the proposed layout would require a wider street right-of-way at the entrance, which would result in less efficient use of the land and increased costs. Furthermore, the single entrance onto Powell School Road would be a future hindrance to emergency workers. In addition, because the subdivision could be expected to house school-age children, increased transportation costs could be expected. The Commission also found that the proposal was not a "small" cluster development within the meaning of the Code.

"3) The plat does not address potential endangered species or habitats as identified by the Maryland Department of Natural Resources." The Commission found that a number of at-risk bird habitats may exist on the site, and that appellant's proposed plat did not address the protection of those at-risk species.

"4) The Plat does not represent 'innovative and creative cluster design of residential development', as it is neither innovative nor creative." The Commission found that the proposed subdivision layout, a "linear arrangement," did not make maximum use of the "limited developable soils," and that an innovative arrangement, which appellant's was not, would have grouped lots in "a configuration that utilize[d] minimum

forest land and create[d] access to the open space areas on which forest production could continue."

"5) The Plat does not represent 'efficient use of land and services in order to reduce construction and maintenance costs, reflect changes in technology in land development, and minimize the operating costs of service delivery and utility systems'." The Commission found that road maintenance, service delivery, and school transportation would need to be provided to this "remote area," and would create "traffic conflicts" between residential and agricultural farming operations on a narrow rural roadway. Furthermore, it was not clear whether water would be available to the fire department in the event of a major fire in the subdivision. Additionally, because appellant was proposing "one of the largest subdivision ['s]" in the county's history in one of the most rural areas of the county, there were no health services, school transportation, police protections, retail providers, food service providers, grocery stores, or general businesses in the area, which would result in additional costs.

"6) The Plat does not 'preserve agricultural lands and enhance the rural atmosphere and visual character of the County'." The Commission found that 166 acres of timber land would be converted to residential lots, fragmenting the forested lands, and that even though the nearest homes would be setback from the road, all subdivision traffic would enter and exit onto a narrow, rural road; thus, thus that a "subdivision of this magnitude will not sufficiently preserved forested lands" or the rural character of the county.

"7) The Plat does not assure that 'to the greatest extent possible cluster open space shall include the most productive agricultural land'." The Commission found that as proposed, the subdivision would create further fragmentation of forested land in an especially sensitive area of the County. The Commission also noted that the property was located in an area where "Right–to–Farm" legislation was applicable, which legislation is intended to protect agricultural activities such as timber harvesting.

"8) The Plat does not assure that 'to the greatest extent possible cluster open space shall include riparian forest buffers, measured 50" from streams and watercourse'." The Commission found that protection of steep slopes, protection of water quality, and protection of potential endangered species had not been guaranteed through site design.

"9) The Plat ... is not consistent with Local and State plans and policies." The Commission, citing to the November 19, 2008 letter from the MDP, found that the plat was inconsistent with the Comprehensive Plan and the Code.

### 6. *Board decision*

On appeal, the Board did not conduct an evidentiary hearing or otherwise hear the appeal *de novo*. *See* Wicomico County Board of Zoning Appeals Rules of Procedure (January 2002), § III.1-5 (providing for the procedures to be followed for appeals to the Board "on the record"); § III.5.E (providing that the "appellant shall have the burden of proving that the decision of the administrative agency was not supported by substantial evidence or was in error as a matter of law"); § I.1.M (providing that an "appeal on the record" includes an appeal from the Commission "based on the record created by the [Commission's] determination"). Rather, and in addition to the testimony and evidence that had been presented to the Commission, as the minutes from the Board hearing indicate, the Board heard arguments from all parties. Pursuant to the minutes, the following transpired.

Appellant argued that the Commission's findings, 1–9, were erroneous. With respect to (1), appellant argued that if a proposed cluster subdivision satisfies the criteria set forth in Code § 225–52, then it must be approved. With respect to (2), appellant argued that the Commission improperly "resorted to the principles' and 'purposes' outlined in sections 225–51–A and 225–27–A to determine whether the ... cluster subdivision satisfies the requirements for approval, rather than focusing on the actual requirements for approval," as set forth in Code § 225–52. With respect to (3), appellant argued that the Commission improperly "insinuated into the zoning and subdi-

vision codes a requirement that does not exist," by using the word "potentially" as the standard rather than "known." With respect to (4), appellant asserted that "innovative and creative" is not defined in the Code, and the Commission could not resort to the "purposes" clauses to support its finding in that regard. With respect to (5), appellant argued that the Commission's findings, again, resorted to a statement of "general purpose," which the Commission does not have the authority to do. With respect to (6), appellant argued that the "reasoning and supporting facts recited for" the finding were "faulty." With respect to (7), appellant asserted that the Code only requires that the "Right–to–Farm" law has no significance, and the Code does not require that all of the " 'most productive agricultural land' " must be included in the cluster open space. With respect to (8), appellant asserted that the record established that the condition had been met. With respect to (9), appellant argued that subdivision plat approval is governed by the zoning and subdivision codes, not the Comprehensive Plan.

Appellees responded that the Commission had already "sent this applicant away several times," and that there were "negative reports dating back to 2005" indicating that the "project was not favored." Appellees argued that appellant sought to have the Board believe that "the sole function of the commission is to process paperwork. When in fact this Commission is given broad discretion to grant requests; nowhere is it mandate[d] that the Commission 'must' approve an application even where all technical or paperwork requirements are met."

In its written decision, the Board indicated that it reviewed and considered "all written evidence, transcripts of testimony, and both written and oral argument presented at or before the public hearing with regard to this appeal on February 26, 2009," and concluded that appellant failed to meet its burden of proof " 'to show that the decision or ruling complained of was arbitrary, capricious, discriminatory or unsupported by any substantial evidence' "; thus, the Board affirmed the Commission.

The Board concluded that the Commission's findings and decision were "proper and best serves the public interest," and were "amply supported by the evidence." Thus, the Board adopted the Commission's findings, numbers one through nine above, in their entirety. The Board also rejected appellant's arguments with respect to the Commission's "interpretation and application of Sections 225-51 and 225-52" of the Code, finding that the Commission had property applied those sections. The Board further rejected appellant's argument that the Court of Appeals decision in *Clarke v. County Comm'rs of Carroll County*, 270 Md. 343, 311 A.2d 417 (1973), would direct that the criteria set forth in Code § 225-51, i.e., the "purpose provision," should not have been considered by the Commission in reaching its decision.

### 7. *Circuit court decision*

The circuit court affirmed the Board, noting that the issue was one of statutory interpretation, i.e., whether the Commission and, by extension, the Board, could lawfully consider §§ 225-27 A and 225.51 A when deciding whether to approve an A-1 cluster development under the Code. The court opined that the Commission (and the Board) could consider the purpose provisions in reaching its conclusion, and the "mere fact that a residential cluster subdivision is an inherently permitted use in an A-1 Agricultural–Rural zoning district does not preclude" such an inquiry. The court likewise concluded that *Clarke* was inapposite and not relevant.

### *Discussion*

Appellant's arguments on this appeal are much the same as set forth above. Appellant argues that because an A-1 "cluster subdivision" is a permitted use pursuant to the "unambiguous criteria" set forth in Code § 225-52, the Commission did not have the authority to deny an application for such use, especially by relying on the "purpose provisions" of §§ 225-27 A and 225-51 A. Appellant then asserts that, in any event, the Commission's findings were unsupported by the evidence.

The County counters that the proposed subdivision did not meet the criteria for a cluster development, that the Commission was permitted to exercise its discretion in evaluating the proposal, and that the Commission had the authority to consider the "purpose provisions," because they are not preambles, but rather are part of the "statutes themselves." The County further asserts, obviously, that the decisions of both the Commission and the Board were supported by substantial evidence.

The remaining appellees respond that both the Code and the Comprehensive Plan empower the Commission to "determine appropriate densities in the County's Agriculture–Rural Districts within the parameters laid down by the Code," and that contrary to appellant's contentions, there is no " 'inherent permission' for a developer to claim the 'density bonus.' " Appellees contend that the language of Code § 225–52, on which appellant relies, is permissive, not mandatory, that appellant bore the burden of persuasion before the Commission, and that the Commission has discretion to grant or deny subdivision approval. Appellees continue that the "intent" and "purposes" of the Code are not meaningless legislative standards, but rather provide the basis for consideration of all zoning forms of action, as noted in Code § 225–3 E, and that neither the intent nor purpose sections of the Code conflicted with any other provisions in the Code. Appellees also assert that any one of the Commission's finding of fact could have served as a basis for its denial of appellant's application, and that the findings of fact were supported by ample evidence.

Preliminarily, we observe that appellant proposes that we should review the decision of the Commission because the Board did not review the Commission's decision *de novo*. First, it is correct that the Board operated under a deferential standard of review, effectively a substantial evidence standard. *See* Code § 200–24 D, which provides that at the Board level, a final subdivision decision of the Commission "shall be presumed by the Board of Appeals to be proper and to best serve the public interest. The burden of proof shall be upon the appellant or appellants to show that the decision was arbi-

trary, capricious, discriminatory or unsupported by any substantial evidence." *See also* § III of the Board's Rules of Procedure, *supra.* Nevertheless, we review the final administrative decision, in this case, the Board's, on the record as it existed before the Board. *See Dept. of Health and Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899 (1994), and *Hikmat v. Howard Co.,* 148 Md.App. 502, 813 A.2d 306 (2002) (in which case we reviewed the Board's decision which itself conducted a limited review of the underlying decision by the zoning administrator). Thus, the Board's review of the Commission's decision was limited in nature, and our review is of the Board's decision.

▮▮▮▮ Judicial review of an administrative decision "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and ... determin[ing] if the administrative decision is premised upon an erroneous conclusion of law." *See Lanzaron v. Anne Arundel County,* 402 Md. 140, 147, 935 A.2d 689 (2007) (and cases cited therein). In doing so, we bypass the judgment of the circuit court and look directly at the administrative decision. *White v. Workers' Comp. Comm'n,* 161 Md. App. 483, 487, 870 A.2d 1241 (2005); *see, e.g., Gigeous v. E. Corr. Inst.,* 363 Md. 481, 495–96, 769 A.2d 912 (2001) (On appeal, "we reevaluate the decision of the agency, not the decision of the lower court."). "Ordinarily, we are constrained to affirm the agency decision only for the reasons given by the agency...." *Id.*

▮▮▮▮ The scope of judicial review of administrative fact-finding is a narrow and highly deferential one. *People's Counsel for Balt. County v. Loyola College in Md.,* 406 Md. 54, 66, 956 A.2d 166 (2008). Accordingly, we will affirm a decision on the facts if it is supported by "substantial evidence." *See id.* at 67, 956 A.2d 166. An agency's fact-finding is based on substantial evidence if "supported by such evidence as a reasonable mind might accept as adequate to support a conclusion." *People's Counsel for Balt. County v. Surina,* 400 Md. 662, 681, 929 A.2d 899 (2007) (quoting *Mayor*

*of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398, 396 A.2d 1080 (1979)). If the issues before the agency were "fairly debatable" based on record evidence, we must refrain from substituting our own judgment for that of the agency. *Annapolis Waterfront Co.,* 284 Md. at 396, 396 A.2d 1080. When "a pure question of law is involved, we may substitute our judgment for that of the administrative agency," *White,* 161 Md.App. at 487, 870 A.2d 1241; nevertheless, we afford some weight to an agency's interpretation of the laws it is charged with administering, *Surina,* 400 Md. at 682–83, 929 A.2d 899, and we must review the agency's decision in a light most favorable to it. *See, e.g., Maryland Aviation Administration v. Noland,* 386 Md. 556, 571, 873 A.2d 1145 (2005).

■ We note that, unlike several of our recent land use decisions,[5] the issue before us is not whether an agency, in granting an application for land use/development, erred because the requested activity was inconsistent with a land use plan. The issue arises out of the non-approval of a proposed subdivision in the A–1 district. Appellant sought approval of a preliminary plat, to develop a cluster, presumably pursuant to Code § 200–7. The request was denied on the ground that it did not meet the terms of the Comprehensive Plan and the standards, including statement of purpose, in Code §§ 225–27 A, 225–51, and 225–52. As set forth above, the first section pertains to the A–1 district, and the latter two govern cluster developments.

In essence, set forth more comprehensively above, appellant argues that the proposed use is a permitted use in the A–1 district, and that the plat complied with the specific statutory standards. Appellant argues it was entitled to approval, therefore, and the Board could not deny approval on the ground that the plat did not meet the purposes of the ordi-

---

**5.** *See, e.g., Archers Glen Partners, Inc. v. Garner,* 176 Md.App. 292, 933 A.2d 405 (2007), *aff'd* 405 Md. 43, 949 A.2d 639 (2008) and *Trail v. Terrapin Run, LLC,* 174 Md.App. 43, 920 A.2d 597 (2007), *aff'd* 403 Md. 523, 943 A.2d 1192 (2008).

nances or the Plan. Appellant also argues the evidence was legally insufficient. We disagree.

First, we observe that the Board's findings, as adopted from the Commission's findings, go beyond just the purposes provisions of the Code and of the Comprehensive Plan. They relate, e.g., to § 225–52 E. ("[t]o the greatest extent possible, cluster open space shall include ... (b) Known habitats of threatened and endangered species; (c) The most productive agriculture land; (d) Steep slopes; ... and (f) Riparian forest buffers....."). In any event, the Board was entitled to consider the purposes of the ordinances and the Comprehensive Plan as part of its analysis. The decision in *Clarke, supra,* relied on by appellant is not to the contrary. In that case, an unnumbered preamble to an ordinance stated the purpose of agriculture district in question was to provide for continued farming activity. Opponents of a proposed subdivision of single family homes argued that the subdivision was barred by that language. The body of the ordinance provided that single family dwellings were permitted in the district and land use was not limited to agriculture. The Court held that the body of the ordinance controlled and dwellings were a permitted use. 270 Md. at 349, 311 A.2d 417. In the case before us, as appellees assert, the purpose sections are part of the ordinances themselves, not a preamble to an ordinance, and there is no asserted internal inconsistency. In other words, the Board did not take the position that cluster developments are not a permitted use.

Relying primarily on *West Montgomery County Citizens Association v. Maryland–National Capital Park & Planning Commission,* 309 Md. 183, 522 A.2d 1328 (1987), and *Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 376 A.2d 483 (1977), appellant argues that the Board exceeded its authority as an administrative body and acted legislatively when it relied on purposes and plans. Those cases are distinguishable. First, a legislative body can delegate the implementation of legislative policy to an administrative body, when the latter operates under specific guidelines. *West Montgomery,* 309 Md. at 199, 522 A.2d 1328. This includes

delegation to an agency administering subdivision regulations when the maximum density is first set by the legislative body. *Id.* at 200, 522 A.2d 1328. In *West Montgomery,* the legislative body attempted to delegate to the planning body the authority to classify specific properties within the zone in question and to determine densities. The legislative body did not specify maximum densities. *Id.* at 201, 522 A.2d 1328. That is not the situation before us. The Board was given considerable latitude in determining the design of a cluster development consistent with the maximum density permitted.

In *Woodward & Lothrop,* the validity of a sectional map amendment was in question. There was an argument that the legislative body illegally delegated to the planning body the zoning power to determine density in newly created zones. 280 Md. at 716, 376 A.2d 483. The Court upheld the legislative action, stating that the legislative body had determined maximum allowable densities and could, subject to procedural requirements and site plan review, delegate to the planning body the right to determine the actual density for a specific property up the maximum permitted. *Id.* at 717, 376 A.2d 483.

Importantly, in the case before us, in the context of approving subdivisions, the Commission and the Board were dealing with a specific design of a proposed subdivision. The language of the Code, emphasized above, is permissive, not mandatory, as appellant contends. While residential use is a permitted use, and a cluster form of development is permitted under certain circumstances, the design of a specific subdivision, including its location and density, is subject to approval. The Board did not deny the plat on the ground that cluster developments were not a permitted use, or that cluster developments generally were inconsistent with the purposes of the applicable ordinance, but rather on the ground that this particular subdivision, as designed, was inconsistent with the purposes. The density permitted in Code § 225–75 generally, and in cluster developments specifically, is the maximum permitted. The maximum density is not available as of right.

Many of the findings made by the Board related to density and location (e.g., lack of roads and services).

█ It is settled that an agency may deny approval of a proposed subdivision, even if it meets zoning requirements, when it does not comply with an applicable plan and the relevant jurisdiction requires compliance with the plan. *See Maryland–National Capital Park and Planning Commission v. Washington Business Park Associates,* 294 Md. 302, 449 A.2d 414 (1982); *Coffey v. Maryland–National Capital Park and Planning Commission,* 293 Md. 24, 441 A.2d 1041 (1982); and *Board of County Commissioners v. Gaster,* 285 Md. 233, 401 A.2d 666 (1979).

Almost all of the Board's findings related to the size, location and design of the specific subdivision (e.g., findings related to size, street arrangement, entrances, linear arrangement, forest buffers, and slopes). Appellant's argument is that the Board could not consider and rely on legislative expressions of general purposes and general planning goals, regardless of whether legally binding, as distinguished from specific requirements. Our reading is that the Board considered the purposes of the applicable ordinances and consistency with the relevant Plan provisions in interpreting and applying the cluster development ordinances in their entirety. It had the power to do so as long as it did not violate specific legislative requirements. An agency's denial shall not be arbitrary, but here, there was substantial evidence to support the findings.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**